Dissent by Judge CALLAHAN
OPINION
BYBEE, Circuit Judge:
Jose Luis Munoz Santos (“Munoz”), appeals the district court’s denial of habeas *990 relief from a magistrate judge’s order certifying Munoz’s extradition to Mexico on charges of kidnapping.[1] In his extradition hearing, Munoz sought to introduce evidence that incriminating statements made against him by his co-conspirators were obtained by torture, and therefore could not support the probable cause required to extradite. The extradition court concluded that the evidence of coercion was not admissible in the extradition hearing, because the allegations were contained in statements in which the witnesses had recanted their previous incriminating statements. The court concluded that this rendered the allegations “contradictory” evidence — as opposed to “explanatory” evidence — and the allegations were therefore inadmissible in an extradition proceeding. See Collins v. Loisel, 259 U.S. 309, 316-17, 42 S.Ct. 469, 66 L.Ed. 956 (1922). The district court denied Munoz’s habeas petition, and a panel of this court affirmed, relying in part on our decision in Barapind v. Enomoto, 400 F.3d 744 (9th Cir.2005) (en banc) (per curiam). We took this case en banc to determine the admissibility in an extradition hearing of evidence suggesting that other evidence presented in the hearing was obtained through coercion or torture.
We hold that evidence of coercion is explanatory, and may be considered by the extradition court, even if the evidence includes a recantation. We reverse the judgment of the district court, and we remand to the district court to issue the writ of habeas corpus unless the extradition court certifies Munoz’s extraditability after proceedings consistent with this opinion.
I. THE EXTRADITION PROCESS
The procedural history of this case will be easier to navigate with an overview of the extradition process in mind. Extradition law is based on a combination of treaty law, federal statutes, and judicial doctrines dating back to the late nineteenth century. See 18 U.S.C. §§ 3181-96; see also Ronald J. Hedges, International Extradi *991 tion: A Guide for Judges 1 n.3 (Federal Judicial Center 2014) (“FJC Manual”) (“The law of extradition in the United States is well established, dating back to the late nineteenth and early twentieth centuries.”).
Authority over the extradition process is shared between the executive and judicial branches. The process begins when the foreign state seeking extradition makes a request directly to the U.S. Department of State. If the State Department determines that the request falls within the governing extradition treaty, a U.S. Attorney files a complaint in federal district court indicating an intent to extradite and seeking a provisional warrant for the person sought. See Vo v. Benov, 447 F.3d 1235, 1237 (9th Cir.2006); see also 18 U.S.C. § 3184. Once the warrant is issued, the district court, which may include a magistrate judge, conducts a hearing to determine “whether there is ‘evidence sufficient to sustain the charge under the provisions of the proper treaty or convention,’ or, in other words, whether there is probable cause.” Vo, 447 F.3d at 1237 (quoting in part 18 U.S.C. § 3184).
The Supreme Court has described these extradition hearings to determine probable cause as akin to a grand jury investigation or a preliminary hearing under Federal Rule of Criminal Procedure 5.1. See, e.g., Charlton v. Kelly, 229 U.S. 447, 461-62, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); Benson v. McMahon, 127 U.S. 457, 463, 8 S.Ct. 1240, 32 L.Ed. 234 (1888); FJC Manual at 10. As the First Circuit described the process:
In probable cause hearings under American law, the evidence taken need not meet the standards for admissibility at trial. Indeed, at a preliminary hearing in federal court a “finding of probable cause may be based upon hearsay in whole or in part.” Fed. R. Crim. P. 5.1(a). This is because a preliminary hearing is not a minitrial of the issue of guilt; rather, its function is the more limited one of determining whether probable cause exists to hold the accused for trial. An extradition hearing similarly involves a preliminary examination of the evidence and is not a trial.
United States v. Kin-Hong, 110 F.3d 103, 120 (1st Cir.1997) (citations omitted). We have said that the extradition court’s review is limited to determining, first, whether the crime of which the person is accused is extraditable, that is, whether it falls within the terms of the extradition treaty between the United States and the requesting state, and second, whether there is probable cause to believe the person committed the crime charged. See, e.g., Cornejo-Barreto v. Seifert, 218 F.3d 1004, 1009 (9th Cir.2000), overruled on other grounds by Trinidad y Garcia v. Thomas, 683 F.3d 952, 957 (9th Cir.2012) (en banc); see also Zanazanian v. United States, 729 F.2d 624, 625-26 (9th Cir.1984) (describing the inquiry as “whether: [1] the extradition judge had jurisdiction to conduct proceedings; [2] the extradition court had jurisdiction over the fugitive; [3] the extradition treaty was in full force and effect; [4] the crime fell within the terms of the treaty; and [5] there was competent legal evidence to support a finding of extraditability”).
Foreign states requesting extradition are not required to litigate their criminal cases in American courts. Accordingly, the scope of the extradition court’s review “is limited to a narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of evidence offered. The larger assessment of extradition and its consequences is committed to the Secretary of State.” Kin-Hong, 110 F.3d at 110. “It is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate’s probable cause hearing.” Eain v. Wilkes, 641 F.2d 504, 508 (7th Cir.1981). Rather, “[t]he function of the committing magistrate is to *992 determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.” Collins, 259 U.S. at 316, 42 S.Ct. 469. Thus, courts have emphasized that “[t]he person charged is not to be tried in this country for crimes he is alleged to have committed in the requesting country. That is the task of the ... courts of the other country.” Eain, 641 F.2d at 508; see FJC Manual, at 10 (“An extradition hearing is not a criminal trial and is not intended to ascertain guilt.”). So long as “the judicial officer determines that there is probable cause, he ‘is required to certify the individual as extraditable to the Secretary of State.’ ” Vo, 447 F.3d at 1237 (quoting Blaxland v. Commonwealth Dir. of Pub. Prosecutions, 323 F.3d 1198, 1208 (9th Cir.2003)).
Given the limited nature of extradition proceedings, neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure apply. See Mainero v. Gregg, 164 F.3d 1199, 1206 (9th Cir.1999); see also Fed. R. Crim. P. 1(a)(5)(A). Instead, 18 U.S.C. § 3190 provides that evidence may be admitted as long as the evidence is authenticated and would “be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped.” The accused, however, does not have the right to introduce evidence in defense because that would require the government seeking his extradition “to go into a full trial on the merits in a foreign country.” Collins, 259 U.S. at 316, 42 S.Ct. 469 (quoting In re Wadge, 15 F. 864, 866 (S.D.N.Y.1883)). The Supreme Court has drawn a distinction between evidence “properly admitted in behalf of the [accused] and that improperly admitted.” Id. at 316, 42 S.Ct. 469. Evidence that may be admitted is evidence that “explain[s] matters referred to by the witnesses for the government,” Charlton, 229 U.S. at 461, 33 S.Ct. 945, while “evidence in defense” that merely “contradict[s] the testimony for the prosecution” may be excluded, Collins, 259 U.S. at 316-17, 42 S.Ct. 469 (quoting Charlton, 229 U.S. at 461, 33 S.Ct. 945). See Barapind, 400 F.3d at 750 (“[E]xtradition courts ‘do[ ] not weigh conflicting evidence’ in making their probable cause determinations.”) (second alteration in original) (quoting Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir.1986)); Hooker v. Klein, 573 F.2d 1360, 1369 (9th Cir.1978) (The “[a]dmission of evidence proffered by the fugitive at an extradition proceeding is left to the sound discretion of the court, guided of course by the principle” that a fugitive’s right to introduce evidence rebutting probable cause is limited to introducing evidence that is “explanatory,” but not “contradictory.”); Mainero, 164 F.3d at 1207 n. 7.
The difference between “explanatory” and “contradictory” evidence is easier stated than applied. The federal courts have struggled to distinguish between the two. See, e.g., Hoxha v. Levi, 465 F.3d 554, 561 (3d Cir.2006) (“In practice,” the line between contradictory and explanatory evidence “is not easily drawn”); In re Extradition of Strunk, 293 F.Supp.2d 1117, 1122 (E.D.Cal.2003) (“The distinction between evidence which ‘explains’ and evidence which ‘contradicts’ seems metaphysical.”). Nevertheless, we have generally settled on the principle that “explanatory” evidence is evidence that “explains away or completely obliterates probable cause,” whereas contradictory evidence is that which “merely controverts the existence of probable cause, or raises a defense.” Mainero, 164 F.3d at 1207 n. 7; see also Eain, 641 F.2d at 511 (“An accused in an extradition hearing has no right to contradict the demanding country’s proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof.”); Shapiro v. Ferrandina, 478 F.2d 894, 905 (2d Cir.1973) *993 (holding that the extradition court had properly excluded evidence that “would in no way ‘explain’ — or, as the district judge put it, ‘obliterate’ — the government’s evidence, but would only pose a conflict of credibility”). We have also described “contradictory” evidence as evidence “the credibility of which could not be assessed without a trial.” Barapind, 400 F.3d at 749-50. In practice, this means that an individual contesting extradition may not, for example, present alibi evidence, facts contradicting the government’s proof, or evidence of defenses like insanity, as this tends to call into question the credibility of the government’s offer of proof. Hooker, 573 F.2d at 1368. However, the accused may testify “to things which might have explained ambiguities or doubtful elements” in the government’s case. Collins, 259 U.S. at 315-16, 42 S.Ct. 469. But he may not impeach government witnesses or produce witnesses whose testimony contradicts evidence already offered by the government. See Charlton, 229 U.S. at 461, 33 S.Ct. 945.
If the extradition court determines that there is probable cause to extradite, it enters an order certifying extradition to the Secretary of State, who ultimately decides whether to surrender the individual to the requesting state. 18 U.S.C. § 3186; Vo, 447 F.3d at 1237; Quinn, 783 F.2d at 789; Exec. Order No. 11,517, 35 Fed. Reg. 4,937 (Mar. 19, 1970), reprinted in 18 U:S.C. § 3193 Historical & Revision Notes. Once the district court has made its probable cause determination and entered an order certifying extradition, the order can only be challenged via a writ of habeas corpus, because the order is not final and there is no other statutory provision for direct appeal of an extradition order. Vo, 447 F.3d at 1240; see Collins v. Miller (Collins I), 252 U.S. 364, 368, 40 S.Ct. 347, 64 L.Ed. 616 (1920).
II. PROCEEDINGS BELOW
Munoz is wanted in Mexico on kidnapping charges arising out of the kidnapping for ransom of Dignora Hermosillo Garcia (“Hermosillo”) and her two young daughters from their home near Tepic, a city in the state of Nayarit, Mexico, in August 2005. Hermosillo and her daughters were abducted from their home at gunpoint by a man in a ski mask. The abductor eventually abandoned the two girls, one at a time, by the side of the road; the youngest of the girls died before she was found. Hermosillo was similarly abandoned, with her mouth, eyes, ears, hands, and feet duct taped, after giving her captor the PIN for her bank card and her husband’s cell phone number. She managed to free herself using a piece of barbed wire, walked to the .highway, and hitched a ride into the town of Jolotemba, where she called her husband to come pick her up.
Mexico requested Munoz’s extradition. He was arrested in the United States on May 17, 2006 in connection with the kidnapping.
A. Extradition Hearing
The U.S.-Mexico extradition treaty states that “[ejxtradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party ... to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place.” U.S.-Mexico Extradition Treaty, art. 3, May 4, 1978, T.I.A.S. No. 9656. In other words, we assess whether, based on the evidence, the person could be brought to trial for the same crime in the United States. Munoz stipulated below that all elements except probable cause have been satisfied — thus, the only element disputed in the extradition hearing, and here on appeal, is whether the probable cause element is satisfied. The key *994 question is what evidence the extradition court may consider in determining whether the charge against Munoz is supported by probable cause.
1. The government’s evidence
In order to establish probable cause that Munoz was involved in the kidnapping, the government relied principally on statements from two of Munoz’s alleged co-conspirators, Jesus Servando ^Hurtado Osuna (“Hurtado”), and Fausto Librado Rosas Alfaro (“Rosas”). The government also submitted three additional statements to corroborate Rosas’s and Hurtado’s stories. We review this evidence in detail below.
a. Rosas’s statement
On March 27, 2006, Rosas submitted a written preliminary statement to the presiding criminal trial judge in his case in Mexico implicating Munoz, Hurtado, and himself in the kidnapping of Hermosillo and her daughters. According to his statement, Rosas abducted Hermosillo and her daughters, but Munoz was the brains of the operation. Rosas stated that he had known Munoz for several years because they “have a business in which [they] buy and sell clothes.” In July 2005, Munoz contacted Rosas on the phone about a “job” he was planning, and stated that he would explain in detail at a planned meeting in Tepic, Nayarit. In mid-July, Rosas met with Munoz, a man named “Negro,” whom Rosas identified as Hurtado, and two others. At this point, Rosas learned what the “job” was. Munoz wanted to recruit Rosas to assist in a plan to kidnap Hermosillo and hold her for ransom, and Rosas agreed to participate. A few days later, the conspirators met at a nightclub at Zapata and Zacatecas Streets to discuss the details, including the amount of ransom to be demanded from “Beto.” “Beto” is a common nickname for Roberto, which is the name of Hermosillo’s husband, Roberto Castellanos Meza (“Castellanos”). According to Rosas, Hurtado was invited to participate in the job at this second meeting, and eventually agreed to join.
On August 9, 2005, the conspirators met again, and Rosas told Hurtado that his job was to watch the house and let the others know “when a lady in a white van arrived.” On August 18, the day of the job, Hurtado informed the conspirators that Hermosillo had arrived home with her two daughters in a white Cherokee van. Rosas stated that he “hid behind the main door,” and once in the house, threatened Hermosillo with a gun while wearing a black ski mask. He was not supposed to take the two girls, but became nervous and put them in the backseat of the white Cherokee as well.
During the drive, Munoz called Rosas and instructed him to release the girls together. Rosas first released the girls and then Hermosillo at three different locations along the side of the road. He met with Munoz later that same day and gave him Hermosillo’s cell phone. Munoz then called Castellanos, and demanded a ransom for Hermosillo and the girls even though they had already been released. Rosas stated that Munoz “kept making phone calls,” and that he did not know why no one went to retrieve the girls from where he had left them, “because the plan was to take them to [a] rented house to take care of them.” Munoz later got into an argument with one of the other conspirators, told Rosas that they “were in terrible trouble,” and that he, Munoz, would handle it himself. Munoz then “escaped” and went to Hermosillo, Sonora.
b. Hurtado’s statement
Hurtado made a sworn statement to a Deputy District Attorney in Tepic, Nayar-it, on March 14, 2006. He requested the assistance of his public defender, Juan Manuel Ramírez Dueñas, who accepted the *995 designation. Hurtado first asserted that a statement he had given on October 12, 2005 to the district attorney was “completely false,”[2] and that he had been “inventing things as they came into [his] head” to throw off the police investigation of the kidnapping. He then stated he was ready to tell what he knew of the kidnapping.
During the last week of July 2005, Hur-tado left his brother’s carpentry shop, and while walking, ran into El Pelón, whom he identified as Jorge Gonzalo Lopez Chavez. Hurtado had known Lopez Chavez for about twenty years because they lived in the same neighborhood. They bought some beers and then Hurtado accompanied Lopez Chavez to a paint store, and when they arrived, Lopez Chavez got out of the car and began speaking with El Chilango, whom Hurtado identified as Rosas. Hurta-do stated that he had only known Rosas by sight for a few months. The three went back out to buy more beer and then returned to the paint store, where they stayed for about fifteen minutes, until Lopez Chavez took Hurtado home.
Approximately four days later, Hurtado ran into Lopez Chavez again, and Lopez Chavez asked Hurtado to accompany him downtown. They ran into Rosas again and the three went to a nightclub located on Zacatecas and Zapata streets. Munoz was waiting for them there. Hurtado did not know Munoz at that time. As they were inside drinking, Hurtado overheard Rosas ask Munoz, “Hey, what’s going on with the job?” Hurtado didn’t pay any attention to their conversation, and eventually left the club with Lopez Chavez. On the way home, he asked Lopez Chavez about the “job,” but Lopez Chavez did not answer. •
The next day, Hurtado went to Lopez Chavez’s house to ask again about the “job,” because he needed money. Lopez Chavez said that he could take Hurtado to see Rosas, who would tell him about the job, and Hurtado agreed. Lopez Chavez *996 and Hurtado met with Rosas at the same nightclub, and Rosas pulled Hurtado aside, and asked if he “was up for a kidnapping.” Hurtado said yes, thinking that Rosas was kidding. On August 9, Hurtado met with Rosas again, and Rosas confirmed that the kidnapping plot was real. Hurtado again agreed to participate and Rosas told him that all he had to do was watch the house and tell the others when Hermosillo arrived. Rosas showed Hurtado pictures of Hermosillo and the two girls, and told him that he would find him when it was time to put the plan into action.
On August 18, Rosas and Lopez Chavez came to Hurtado’s house and told him that they were going to pull the job that night. Hurtado was supposed to watch the house and call Rosas’s cell phone when Hermosillo arrived, and Rosas, Munoz, and another conspirator, Lopez Mendivil, would grab Hermosillo. The three were to drive Hermosillo to a rented house in a nearby town, and Hurtado was to wait and would be paid by Rosas. At about 9:00 that night, Hurtado took a white taxi to the neighborhood to keep watch. He called Rosas from a payphone when Hermosillo drove up, and then watched as Lopez Chavez and Rosas drove up to the house. Rosas ran into the garage “hooded,” put Hermosillo and her two daughters in Hermosillo’s car, and drove off at “full speed.”
Hurtado got back into the taxi and drove by the place where Munoz and Lopez Men-divil were waiting, where he heard Munoz “telling ... off’ Rosas on the phone for not following the plan. The taxi then drove Hurtado home. Hurtado also noted that when he was driving around in the taxi that same night after the kidnapping, he was stopped twice by “afi agents” (Mexican federal authorities) and questioned about what he was doing at that time of night, but then released. He did not see the other members of the conspiracy again.
At the end of this statement, Hurtado declared that he had read Munoz’s statement and that Munoz, Lopez Chavez, Ro-sas, and Lopez Mendivil lied when they denied their involvement. He identified Munoz’s photograph as well. Finally, he stated that he was under “no coercion, physical or moral violence on the part of [the District Attorney’s] office or on the part of the officers of the state police.”
c. Other evidence
The government submitted three other statements to corroborate Rosas’s and Hurtado’s statements implicating Munoz. It included Hermosillo’s statement describing the details of her kidnapping and release and her identification of Rosas. According to Hermosillo, the abductor tugged on his ski mask while they were driving, and Hermosillo noticed that he had “a mole or a scar” on his nose. Hermosillo later identified Rosas as the man who had abducted her from her home based on photographs the Mexican authorities showed her. The government also introduced a statement by Benigno Andrade Hernandez (“Andrade”), who told Mexican prosecutors that he had been approached by Rosas and Munoz a month or so before the kidnapping, and asked if he was interested in “pulling a job” to extort “Beto” for two million pesos. Finally, the government included a statement from Castellanos, made to Mexican prosecutors, in which Castellanos described a phone call he had received from his wife’s phone the day of the kidnapping, but had been cut off before he could answer. Castellanos tried unsuccessfully to locate his family after his brother informed him that the garage door to the family’s house had been left open, and that Hermosillo’s car was missing. The next morning, Castellanos received a call from Hermosillo asking him to pick her up in the town where Rosas had abandoned her.
*997 2. Munoz’s additional evidence
To undermine the government’s showing of probable cause, Munoz sought to introduce additional evidence at his extradition hearing, including several statements by Rosas and Hurtado alleging that their statements implicating Munoz had been obtained by torture or coercion. Again, we review these statements in detail.
a. Rosas’s additional statements
■ On May 25, 2006, two months after providing his original preliminary statement, Rosas was given the opportunity to verify or retract his preliminary statement before a Mexican judge, under oath.[3] Rosas retracted, asserting that the police had forced him to sign his previous incriminating statement. He specifically identified a man named Martin Lujan, whom he described as a “coordinator,” who “took [him] out of the place [he] was in by beating and threatening [him].” Rosas was told that if he did not sign the statement something “bad” would happen to his family, and that the police knew his wife had arrived in Hermosillo, Sonora. Rosas was asked whether state police forced him to appear before the media and “declare himself guilty,” and he answered, ‘Tes.”
Munoz also sought to introduce another statement by Rosas, made on June 20, 2006, again sworn in court. Rosas was represented by a public defender. He denied the parts of his preliminary statement in which he implicated himself, stating that when he was taken into court, he was only asked whether he recognized his own signature on the statement. He was not read the statement itself. He was told that something bad would happen to his family, and that the police knew his wife and son had arrived in a black Altima. Rosas also stated that he was beaten and threatened on several occasions while in custody. He again identified Martin Lujan, whom he described as the “General Director.”
According to his June 20th statement, when Rosas was detained, he was taken to a cell, “without lights, and with only a chair.” He was tied to the chair, had a bag placed over his head, and was struck repeatedly in the chest while being asked what he knew about the kidnapping. Rosas repeated facts that he remembered from the district attorney’s file on the case, “so that they would stop torturing [him].” The next morning he was taken out of his cell, and told that he was going to a press conference, at which he was expected to implicate himself and Munoz, or else he would be beaten again. Rosas went to the press conference but denied his involvement in the kidnapping; he was brought back to the prison and held incommunicado for two days, during which time Lujan periodically beat him.
Eventually, the police sent a detailed written statement to Rosas through his lawyer, and Rosas was directed to sign it or else “something serious” would happen to his family. Rosas’s' lawyer “never told [him] anything” regarding the statement— Rosas stated that he made the decision to sign the statement alone, “due to the threats and beatings” to which he .was subjected. Rosas was asked, in court if Lujan ever told him why he wanted to force Rosas to confess, and Rosas said that Lujan told him that he was under pressure from “the father of the victims,” who was “calling him and pressuring him from the outside.”
*998 b. Hurtado’s additional statements
On March 22, 2006, Hurtado gave a similar statement before a judge in Mexico, under oath and represented by private counsel. Hurtado stated that he “[did] not ratify” either his October 12, 2005 or March 14, 2006 statements, because the statements were false and had been obtained under torture. Hurtado stated that after he dropped his daughter off at his mother’s house, he was abducted, and forced into a “gray Lobo truck with tinted windows.” A “cap” was placed over his head, and he was taken to an unknown location. Someone started hitting him in the face, asking him to “tell them the truth.” A plastic bag was placed over his head and tightened until he could not breathe. Hurtado told his captors that he didn’t know anything. He was shown photographs of people but did not recognize anyone. His captors poured water into his nose and mouth, beat him, and questioned him again. According to Hurtado, this went on for several days. He was told more than once that if he did not “cooperate” his daughter would be given to him in “pieces.”
Eventually, Hurtado was taken out at night, blindfolded, and presented to “a man at a desk,” where he was told that if he stated what he had been told to state, he would be allowed to see his family. He made his statement as directed, and then was taken back to where he was being held captive. The day before he was brought before the court, he was taken to the Public Prosecutor’s Office, and the chief of the judiciary police told him that he had to “say what they had told [him] before.” He was not allowed to call his family or speak with a lawyer. The police brought him before “cameramen” who were taking pictures and asking questions.
Hurtado stated that he had nothing to do with the kidnapping and did not know anyone involved. He identified the “man who caught [him]” as a “potbellied, tall judiciary police office with short, wavy hair.” His attorney asked the court to take note of Hurtado’s injuries, and the Clerk of the Court noted that Hurtado had “minor bruises on both cheekbones ... complain[ed] about [a] left earache, as well as pain on the right foot next to the shin.”
Hurtado gave another sworn statement before a judge on May 25, 2006, again represented by counsel, in which he reiterated much of his March 22 statement. He alleged that he had been detained by the state police for twelve days, during which time he was tortured, had bags placed over his face, was punched in the stomach, had water poured into his nose and mouth, and received death threats. He reiterated that he was “force[d]” to make incriminating statements.
On November 21, 2006, Hurtado gave further testimony in court, under oath and represented by counsel. He wished to add to his previous statements. He again reiterated that he had been detained, tortured, and kept hooded for days, and repeatedly been shown photographs of people he could not identify. He added that after he had been taken to the Prosecutor’s Office to make a statement, he was taken again to the house where he was being held, and was given a written statement to sign. Several days later, he was taken back to the Prosecutor’s Office, and when he arrived at the detention center, an inmate named Martin Lujan threatened him, and told him not to change his statement or he would be killed. He stated that he was afraid for his life and that of his family.
Finally, Munoz sought to introduce a declaration Hurtado made under oath on June 10, 2009, in which Hurtado essentially echoed the details of his previous statements. He repeated that he had been detained and beaten by the police for twelve *999 days, told what statements to make, and that he ultimately agreed to sign a written statement because his family was threatened.
c. Other evidence
Munoz also sought to submit evidence to corroborate the torture allegations, including evidence that he had been tortured and his family threatened; a statement from another alleged co-conspirator, Lopez Chavez, alleging that he had been tortured; evidence that Rosas’s lawyer colluded with the Mexican government to get Rosas to sign an incriminating statement; evidence supporting Munoz’s alibi; and evidence regarding the acquittal of another co-conspirator for insufficient evidence.
3. The extradition court’s decision
In a published order, a magistrate judge, sitting as the extradition court, carefully considered the government’s evidence against Munoz and Munoz’s offer of evidence rebutting the government’s probable cause showing. The court concluded that Munoz was extraditable and declined to consider the additional evidence Munoz sought to admit, including the statements by Rosas and Hurtado alleging torture. In re Extradition of Munoz Santos, 795 F.Supp.2d 966 (C.D.Cal.2011). The extradition court focused on the fact that the allegations of coercion were contained in statements in which Rosas and Hurtado had also recanted their previous statements implicating Munoz. Id. at 987. The court noted that the Ninth Circuit had “never determined” whether “recantation evidence is admissible in an extradition hearing.” Id. at 988 (quoting Mainero, 164 F.3d at 1207 n. 7). However, the extradition court relied on our decision in Bara-pind, in which we concluded that probable cause was not undermined in an extradition proceeding by a witness’s recantation of a prior incriminating statement, because the credibility of the recantation could not be determined without a trial, “which would exceed the limited mandate of an extradition court.” Id. (quoting Barapind, 400 F.3d at 749). The extradition court concluded that the recantation statements were “contradictory” evidence inadmissible in extradition proceedings. Id. at 988-89. Because Rosas’s and Hurtado’s allegations of coercion were included in their recantation statements, the allegations of coercion were likewise inadmissible “contradictory” evidence. Id. at 989. Accordingly, based on the admissible evidence offered by the government, the extradition court concluded that there was sufficient evidence to support a finding of probable cause, and it certified that Munoz was extraditable. Id. at 979-83.
B. Habeas Proceedings
In 2011, Munoz filed a habeas petition challenging the extradition order, claiming that the extradition court had committed legal error in ruling the evidence of torture inadmissible. App. at 2-3. In a thorough opinion, the district court declined to issue the writ.[4] The district court agreed that if Munoz could show that the confessions of key witnesses “were procured through torture or duress,” that showing would “undermine the evidence on which the government relies to meet its burden.” App. at 8. The court distinguished between “recantation” statements that directly contradict a previously offered version of the facts, which would require the extradition court to make impermissible credibility determinations, and evidence that a statement was procured by torture. App. at 10. The court explained that evidence that a statement was procured by torture is not *1000 necessarily “contradictory,” and thus inadmissible in extradition proceedings, because it does not inherently “present an alternate version of events, or factually contradict the [requesting] government’s probable cause narrative.” App. at 11. Rather, evidence that a statement was obtained through torture “addresses the reliability of the incriminating statements the government has presented and questions their competence.” App. at 11. Therefore, such evidence is theoretically admissible in extradition proceedings. App. at 11-12. The court observed:
While extradition courts cannot weigh conflicting evidence, evidence of torture does not require such weighing. Evidence of torture addresses the circumstances under which the government’s witnesses made inculpatory statements; an extradition court properly considers evidence of torture, duress, or unlawfully procured confessions in deciding the reliability of the government’s evidence.
App. at 12.
Nevertheless, the district court concluded that it was impossible to distinguish between Rosas’s and Hurtado’s statements regarding torture, and their recantation of their previous incriminating statements.[5] Evaluating the torture statements “would almost certainly require the extradition court to determine whether the recantations are more reliable than the original inculpatory statements.” App. at 19. Thus, the district court ultimately agreed with the extradition court that the torture statements could not be considered. Likewise, the district court concluded that admission of the other evidence Munoz sought to offer, e.g., the alibi evidence, etc., was either irrelevant to the question of how the inculpatory statements were obtained or would require the extradition court to make impermissible credibility determinations and thus was properly excluded. App. at 20-24.
A panel of this court affirmed, agreeing that the statements concerning torture were properly excluded by the extradition court, and concluding that Rosas’s and Hurtado’s statements were “inadmissible recantations.” Munoz Santos v. Thomas, 779 F.3d 1021, 1026-28 (9th Cir.2015). The panel concluded that the “allegations of torture are ‘inextricably intertwined’ with Rosas’[s] and Hurtado’s recantations,” because “[e]ach recantation includes both a disavowal of the witness’s prior inculpatory statements, as well as allegations that the statements were procured by torture.” Id. at 1027. As a result, “the extradition court would necessarily have had to evaluate the veracity of the recantations and weigh them against the conflicting inculpatory statements. Doing so would have exceeded the limited authority of the extradition court.” Id.
We granted en banc review and vacated the panel opinion. Munoz Santos v. Thomas, 804 F.3d 998 (9th Cir.2015).
III. JURISDICTION AND STANDARD OF REVIEW
The extradition court had jurisdiction under 18 U.S.C. § 3184. The district court had jurisdiction pursuant to 28 U.S.C. § 2241(a), and we have jurisdiction under 28 U.S.C. §§1291 and 2253(a). Under § 3184, “any justice or judge of the United States, or any magistrate judge authorized *1001 so to do by a court of the United States” may sit as an extradition court to consider whether the evidence is “sufficient to sustain the charge under the provisions of the proper treaty or convention.” If so, the extradition court “shall certify the same ... to the Secretary of State.” 18 U.S.C. § 3184.
There is no right of direct appeal to a district court or a court of appeals from the extradition court’s certification of extraditability. Because the extradition court’s order is not final for purposes of 28 U.S.C. § 1291, the “only available avenue to challenge an extradition order” is through a habeas petition. Vo, 447 F.3d at 1240; see Skaftouros v. United States, 667 F.3d 144, 157 (2d Cir.2011); Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1402 (9th Cir. 1988).
The district court’s habeas review of an extradition order is limited to whether: (1) the extradition magistrate had jurisdiction over the individual sought, (2) the treaty was in force and the accused’s alleged offense fell within the treaty’s terms, and (3) there is “any competent evidence” supporting the probable cause determination of the magistrate.
Vo, 447 F.3d at 1240; see Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925). Our review is similarly circumscribed. We review the district court’s judgment de novo. McKnight v. Torres, 563 F.3d 890, 892 (9th Cir.2009). In this context, that means that, with respect to the extradition court, we stand in the same position as did the district court. We review the extradition court’s legal rulings de novo, and its findings of fact for clear error. And “[b]ecause the magistrate’s probable cause finding is thus not a finding of fact ‘in the sense that the court has weighed the evidence and resolved disputed factual issues,’ it must be upheld if there is any competent evidence in the record to support it.” Quinn, 783 F.2d at 791 (quoting Caplan v. Vokes, 649 F.2d 1336, 1342 n. 10 (9th Cir.1981)).
IV. ANALYSIS
The issue before us is whether the extradition court properly refused to consider evidence that Rosas’s and Hurtado’s statements — in which they confessed to their involvement in the kidnapping and implicated Munoz — were obtained by coercion, including torture. The extradition court refused to consider evidence of coercion because it was contained in subsequent statements in which Rosas and Hur-tado recanted their earlier testimony. The extradition court excluded the subsequent statements because they were “contradictory” and not “explanatory,” rendering the statements inadmissible under the Supreme Court’s framework governing an extraditee’s ability to present evidence in the extradition proceeding. For reasons we explain in Part A, this was legal error. The extradition court should have considered the evidence of coercion because a coerced statement is not competent evidence and cannot support probable cause.
In Part B we address a second issue: whether, assuming arguendo that we must exclude Rosas’s and Hurtado’s confessions, there is sufficient evidence of probable cause to affirm. We conclude that we cannot resolve this question on this record^ and we remand this case to the district court with instructions to return this case to the extradition court for further proceedings to address the competency and the sufficiency of the government’s evi- • dence.
A. Exclusion of Rosas’s and Hurtado’s Statements
Our task is to determine whether there is any competent evidence supporting the extradition court’s finding of probable cause. The extradition court found proba *1002 ble cause based largely on inculpating statements made by Rosas and Hurtado, Munoz’s alleged co-conspirators. We took this case en banc to clarify whether evidence that these statements were obtained by torture or other coercion constitute “contradictory” evidence inadmissible in an extradition proceeding, or admissible “explanatory” evidence.
There can be little question that, standing by themselves, Rosas’s March 27, 2006 statement and Hurtado’s March 14, 2006 statement, whether considered separately, together, or together with statements from Hermosillo (the victim), Castellanos (her husband), and Andrade (who may have heard early plans for the kidnapping) constitute probable cause to believe that Munoz participated in the kidnapping of Hermosillo and her daughters. The statements were detailed and authenticated. Hurtado gave his statement in the presence of his public defender and under oath to a deputy district attorney in Mexico. Rosas submitted his statement in writing to the judge presiding over his case and asked that it be included in the court’s record.
The extradition court, however, refused to consider subsequent statements by Ro-sas and Hurtado in which they recanted their initial statements, claiming that the Mexican police had coerced them into making those statements. The extradition court, and the district court on habeas, concluded that the allegations of torture were inadmissible because, as the district court described it, the claims were “inextricably intertwined” with the recantation statements. App. at 19-20; Extradition of Munoz Santos, 795 F.Supp.2d at 988-90. In other words, both courts reasoned that it was impossible to determine the credibility of the allegations of torture without determining the credibility of Rosas’s and Hurtado’s recantation statements. Because the credibility of the recantation statements could not be determined without a trial, those statements were inadmissible as “contradictory” evidence. App. at 19-20; Id. at 990.
As we review Rosas’s and Hurtado’s various subsequent statements, which are quite detailed, their claims are of two types (and here we are simplifying): (1) I wasn’t involved, and (2) the reason I previously said I was involved is that I was tortured or otherwise coerced. The first type of statement is a recantation of the kind that courts have properly refused to consider. For example, in Barapind we considered whether there was evidence to support Barapind’s extradition to India for crimes in connection with his activities as a leader in the All India Sikh Student Federation. In support of the charges, India produced an affidavit from a police inspector, who claimed that Nirmal Singh, an eyewitness, had identified Barapind as one of the principals in a shootout with government officials. Barapind, 400 F.3d at 752. Barapind produced a second affidavit from Nirmal in which he denied having identified Barapind at all. “The extradition court determined that Barapind’s evidence was insufficient to destroy probable cause, concluding that a trial would be required to determine who was telling the truth.” Id. We concluded that the court made the proper decision. Id.
Similarly, in Bovio v. United States, the petitioner argued that probable cause was lacking, in part, because the major witness on which the government relied had admitted to lying during the investigation. 989 F.2d 255, 259 (7th Cir.1993). The Seventh Circuit rejected this argument, noting that “Bovio [had] no right to attack the credibility of witnesses,” because “issues of credibility are to be determined at trial.” Id. Consistent with both Barapind and Bovio, in Shapiro v. Ferrandina, the Second Circuit upheld the extradition court’s refusal to admit evidence “that one declar- *1003 ant of an inculpatory statement had once blackmailed Shapiro’s father and that certain fraudulent statements alleged to have been made by Shapiro had not in fact been made.” 478 F.2d at 905. The court noted that “such statements would in no way ‘explain’ ... the government’s evidence, but would only pose a conflict of credibility.” Id.
Rosas’s and Hurtado’s recantations of their prior confessions are, indeed, contradictory. But their claims that their prior statements implicating themselves and Munoz were obtained under duress are not contradictory, but explanatory. Recanting statements contest the credibility of the original statements, presenting a different version of the facts or offering reasons why the government’s evidence should not be believed. Reliable evidence that the government’s evidence was obtained by torture or coercion, however, goes to the competence of the government’s evidence.
The Supreme Court has long held that the Due Process Clause of the Fifth and Fourteenth Amendments bars the admission of coerced confessions. “The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession.” Ashcraft v. Tennessee, 322 U.S. 143, 155, 64 S.Ct. 921, 88 L.Ed. 1192 (1944). As the Court explained in Brown v. Mississippi, “trial ... is a mere pretense where the state authorities have contrived a conviction resting solely upon confessions obtained by violence ... and the use of the confessions thus obtained as the basis for conviction and sentence [is] a clear denial of due process.” 297 U.S. 278, 286, 56 S.Ct. 461, 80 L.Ed. 682 (1936); see Ashcraft, 322 U.S. at 159, 64 S.Ct. 921 (Jackson, J., dissenting) (“Forced confessions are ruled out of a fair trial.”); Ward v. Texas, 316 U.S. 547, 555, 62 S.Ct. 1139, 86 L.Ed. 1663 (1942) (“[T]his confession was not free and voluntary but was the product of coercion and duress, that petitioner was no longer able freely to admit or to deny or to refuse to answer, and that he was willing to make any statement that the officers wanted him to make.”); Chambers v. Florida, 309 U.S. 227, 236-37, 60 S.Ct. 472, 84 L.Ed. 716 (1940); Palko v. Connecticut, 302 U.S. 319, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937).
We and other courts have sometimes explained the inadmissibility of coerced confessions in terms of their unreliability. See, e.g., Crowe v. County of San Diego, 608 F.3d 406, 433 (9th Cir.2010) (“[C]oerced confessions are legally insufficient and unreliable and thus cannot factor into the probable cause analysis.”); Livers v. Schenck, 700 F.3d 340, 358 (8th Cir. 2012) (“No reasonable officer could believe statements from a coerced confession could alone provide probable cause.”); Kin-Hong, 110 F.3d at 121 (“[A] confession obtained by duress is inherently unreliable and would be given little weight even if the confession were authenticated.”). But the Supreme Court has made clear that “[t]he aim of the requirement of due process is not to exclude presumptively false evidence but to prevent fundamental unfairness in the use of evidence whether true or false.” Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941) (emphasis added). The Court offered an extended explanation in Lego v. Twomey:
[Tjhere may be a relationship between the involuntariness of a confession and its unreliability. But our decision [in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)] was not based in the slightest on the fear that juries might misjudge the accuracy of confessions and arrive at erroneous determinations of guilt or innocence. That case was not aimed at reducing the possibility of convicting innocent men.
*1004 Quite the contrary, we feared that the reliability and truthfulness of even coerced confessions could impermissibly influence a jury’s judgment as to volun-tariness. The use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principles.
404 U.S. 477, 484-85, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (emphasis added) (footnote omitted). “To be sure, confessions cruelly extorted may be and have been, to an unascertained extent, found to be untrustworthy. But the constitutional principle of excluding confessions that are not voluntary does not rest on this consideration.” Rogers v. Richmond, 365 U.S. 534, 541, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); see also United States v. Preston, 751 F.3d 1008, 1017-18 (9th Cir.2014) (en banc).
■ The Court’s clarity on this point gives us a different perspective on Munoz’s claim that the principal evidence against him was obtained through coercion that may have amounted to torture.[6] His claims of coerced testimony are independent of the truthfulness of the testimony. It is irrelevant whether Rosas’s and Hurtado’s statements about their involvement in the kidnapping are true; we do not care if they have indicia of reliability or whether they are corroborated by other evidence. If they were obtained by coercion in violation of the principles in the Due Process Clause of the Fifth Amendment, the statements are not competent and cannot support probable cause. In the language of the extradition cases, such statements are not “contradictory” because the truthfulness of the statements is not the issue. The fact of coercion is “explanatory” because,, as the district court stated, it “addresses the cir-cúmstances under which the government’s witnesses made inculpatory statements.” App. at 12-,
An allegation of coercion is essentially a second-order question — a question about questions; the allegation undermines the process by which the evidence was obtained, not the credibility of the evidence itself. There are a number of examples in which we and other courts have distinguished between the evidence and the process. This is true even where the allegations of torture or coercion appear alongside claims that a previously made incriminating statement is not true — i.e., where the allegations of coercion include recantation statements. In these cases; once the evidence of coercion is admitted, courts weigh whether the allegations of coercion are credible, and if so, whether probable cause still exists once the tainted evidence is excluded from the analysis. See, e.g., Cornejo-Barreto, 218 F.3d at 1008 (“To isolate any possible taint the alleged torture could have on the evidence supporting the probable cause determination, the judge considered the sufficiency of the evidence without the challenged confessions.”); Mainero, 164 F.3d at 1206 (noting that the magistrate judge “carefully considered the recantations offered ... [and] ... acknowledged that the suggestion of torture is present in the record,” but upholding the lower court’s conclusion that the torture allegations were not sufficiently reliable to undermine probable cause); In re Extradition of Atuar, 300 F.Supp.2d 418, 431 (S.D.W.Va.2003) (noting that a recantation statement is admissible “[i]f it is evident ... that the inculpating statement was coerced and not made voluntarily,” in which case the court *1005 should consider “which of the statements is more reliable in view of the totality of the evidence”), aff'd, 156 Fed.Appx. 555 (4th Cir.2005); In re Extradition of Singh, 170 F.Supp.2d 982, 1021-23, 1028-29 (E.D.Cal.2001) (evaluating allegations of torture and concluding that the statements were reliable and destroyed probable cause as to two of eleven charges), aff'd in relevant part by Barapind, 400 F.3d 744; In re Extradition of Contreras, 800 F.Supp. 1462, 1469 (S.D.Tex.1992) (“Obviously, where the indicia of reliability is on the prior inculpating statement, then a recantation, if admitted, would not negate the existence of probable cause ... [but] where a prior statement is shown to be coerced and the indicia of reliability is on the recantatiop, then the subsequent statement negating the existence of probable cause is germane.”); Gill v. Imundi, 747 F.Supp. 1028, 1043-47 (S.D.N.Y.1990) (granting writ of habeas corpus because new extradition hearing was required in light of a recent ruling by an Indian court that the confession on which probable cause was based had been coerced); cf. Hoxha, 465 F.3d at 561 (holding that the district court did not err in excluding recantation statements, some of which included allegations of torture, because other competent evidence supported probable cause).
In sum, we have treated allegations of torture or coercion differently from a recantation statement, even where the allegations of coercion are made in conjunction with a claim that a previous incriminating statement was false. Contrary to what the district court and the extradition court concluded here, it is possible to separate the two inquiries. Indeed, to hold ’otherwise would create an odd rule in which allegations of coercion would only be admissible when the witness admits that the incriminating statements were true. This makes little sense, because the question of whether a recantation statement is credible or not is irrelevant to the question of whether the incriminating statement — recanted or not — was obtained under coercion, i.e., is competent evidence. We conclude that evidence that a statement was obtained under torture or other coercion constitutes “explanatory” evidence generally admissible in an extradition proceeding. An extradition court may properly consider evidence of torture or coercion in considering the competency of the government’s evidence, even when the claim of coercion is intertwined with a recantation.
Our decision in Barapind supports our conclusion. We observed in that case that the extradition court had conducted “a careful, incident-by-incident analysis as to whether there was impropriety on the part of the Indian government” in obtaining the statements on which probable cause rested. Barapind, 400 F.3d at 748. On two of the eleven charges brought against the petitioner, the extradition court found that allegations of torture undermined probable cause. With respect to one of the charges, the single witness alleged that his previous incriminating statement was involuntarily obtained and that he had never identified Barapind or the other alleged assailants in the case. Extradition of Singh, 170 F.Supp.2d at 1021-22. India declined to challenge the witness’s explanation.[7] The extradition court weighed the credibility of this statement and concluded that, under the totality of the circumstances, the later affidavit “destroy[ed] the competence of the evidence and obliterated probable cause” for the charge. Id. at 1023. On the second charge, India had submitted the confession of a co-conspirator, who was later killed. Barapind submitted affidavits *1006 from three witnesses who stated that the confession had been obtained by torture while the co-conspirator was in police custody. India apparently did not dispute this evidence, and the court again concluded that the three witness statements alleging torture were reliable and the confession should be excluded. Id. at 1028-29.
The portion of our decision in Barapind that appears to have presented a stumbling block for both the extradition court and the district court here involved a different charge based on the inculpatory affidavit of Makhan Ram. Barapind offered a second affidavit from Ram in which Ram claimed that police had forced him to sign blank pieces of paper, on which statements incriminating Barapind were later written. Ram said his statement implicating Bara-pind was a “falsification.” Id. at 1024; see also Barapind, 400 F.3d at 749-50. The extradition court analyzed this statement and factors going to its reliability, and ultimately concluded that, under the circumstances, the court could not determine Ram’s credibility. Accordingly, the extradition court concluded that Ram’s statement did not undermine probable cause. Extradition of Singh, 170 F.Supp.2d at 1024-25. We affirmed, finding that Ram’s statement constituted “conflicting evidence,” because its credibility could not be determined without a trial, and that it would have been improper for the extradition court to engage in the kind of review that would have been necessary to determine the statement’s credibility. Barapind, 400 F.3d at 749-50.[8]
The extradition court and the district court here relied on this section of Bara-pind in concluding that Rosas’s and Hur-tado's statements alleging coercion were inadmissiblé evidence. But what the extradition court did here is different from what the extradition court did in Bara-pind. In Barapind, the extradition court first considered the allegations of coercion, before concluding that it could not determine their reliability without exceeding the scope of its review. Here, however, the extradition court refused to consider Ro-sas’s and Hurtado’s statements in the first instance. This was error. A petitioner in an extradition proceeding has the right to introduce evidence that “explains away” or “obliterates” probable cause, and credible evidence that a statement was obtained under coercion does just that by undermining the competence of the government’s evidence.
The dissent argues that the government’s evidence need only be properly authenticated, as required under 18 U.S.C. § 3190, to be admissible in an extradition proceeding, seeming to suggest that admissibility necessarily renders the government’s evidence sufficient to satisfy probable cause. Dissenting Op. at 1042-43. Such a suggestion conflates the admissibility standard with the standard required to satisfy probable cause. Simply because evidence has been authenticated does not mean any evidence the government submits is sufficient to satisfy probable cause. Were that the case, the judiciary’s role in the extradition process would be meaningless. Our role here is indeed a limited one, but “[t]his is not to say that a judge ... [in] an extradition proceeding is expected to wield a rubber stamp.” Skaftouros v. United States, 667 F.3d 144, 158 (2d Cir.2011). Rather, our “function in an extradition hearing is ... to ensure that our judicial standard of probable cause is met by the Requesting Nation.” United States v. Linson, 88 F.Supp.2d 1123, 1128 (D.Guam 2000). As we have made clear, *1007 the manner in which evidence used to support probable cause was obtained is relevant in determining whether the probable cause standard has indeed been satisfied. Our case law, including Supreme Court case law that the dissent largely ignores, does not allow us to leave this determination to the Secretary of State — or, for that matter, the Mexican courts — under principles of deference to the executive or international comity. Dissenting Op. at 1047. The probable cause determination has been placed squarely in the judiciary’s hands and is ours alone.[9]
We wish to be clear, however, that the scope of our holding here is limited, and that our decision should not be taken as a license to engage in mini-trials on the question of coercion or torture. The extradition court does not have to determine which party’s evidence represents the truth where the facts are contested. Where an extradition court first considers evidence that a statement was improperly obtained, but concludes that it is impossible to determine the credibility of the allegations without exceeding the scope of an extradition court’s limited review, the court has fulfilled its obligation — as the extradition court did in Barapind. If the court cannot determine the credibility of the allegations (or other evidence) once it has examined them, the inquiry ends. Probable cause is not undermined, and the court must certify the extradition. See 18 U.S.C. § 3184.
The extradition court, of course, may consider other evidence, separate from potentially tainted evidence, that will satisfy the probable cause requirement. See, e.g., Barapind, 400 F.3d at 749-50; Mainero, 164 F.3d at 1206; cf. Hoxha, 465 F.3d at 561-62 (holding that exclusion of evidence of coercion was proper where other competent evidence supported probable cause). Furthermore, we note that the fact that evidence of torture can properly be considered by the extradition court as “explanatory” evidence does not mean that all evidence of torture must be admitted. The extradition court still has broad discretion to determine the admissibility of the evidence before it. See Mainero, 164 F.3d at 1206; Hooker, 573 F.2d at 1369; see *1008 also In re Extradition of Sindona, 450 F.Supp. 672, 685 (S.D.N.Y.1978) (“The extent of such explanatory evidence to be received is largely in the discretion of the judge ruling on the extradition request.”).
Our holding today is narrow: Evidence that a statement was obtained by coercion may be treated as “explanatory” evidence that is admissible in an extradition hearing.
B. Probable Cause
Although we have concluded that the-extradition court improperly excluded Rosas’s and Hurtado’s subsequent statements alleging that their initial inculpatory statements had been obtained by coercion, our inquiry is not at an end. Our inquiry-on habeas review is whether any competent evidence supports the extradition court’s probable cause finding. Vo, 447 F.3d at 1240; see Fernandez, 268 U.S. at 312, 45 S.Ct. 541. Evidentiary error alone is not a sufficient basis on which to grant a writ of habeas in the extradition context. See Collins, 259 U.S. at 316, 42 S.Ct. 469 (“It is clear that the mere wrongful exclusion of specific pieces of evidence, however important, does not render the detention illegal.”).
The district court carefully considered whether, if the court excluded Rosas’s and Hurtado’s statements, there remained sufficient evidence to support a probable cause finding against Munoz. It concluded that the matter was “close,” but that there was not. App. at 17-18 n.41. We share the district court’s doubts. Neither Castellanos’s nor Hermosillo’s statements mention Munoz; at best they connect Rosas to the kidnapping, but only Rosas’s and Hurtado’s statements implicate Munoz. Without Rosas’s and Hurtado’s statements, only Andrade’s statement that Rosas and Munoz approached him about a “job” to extort “Beto” for two million pesos potentially connects Munoz to the kidnapping. This statement, however, lacks any other specifics that would suggest the “job” was a kidnapping involving Roberto Castellanos’s family. Standing alone, Andrade’s statement is insufficient to support probable cause. This is not a case in which there is overwhelming evidence available from other sources. Nevertheless, because the question is a close one, we think the extradition court should decide this question in the first instance, when it will have the opportunity to redetermine the admissibility of Munoz’s evidence and then consider all of the evidence together.
The extradition court here “operated under a mistaken understanding of what constitutes circuit law,” Barapind, 400 F.3d at 750, and took an overly restrictive view of its authority to consider evidence that an inculpatory statement was obtained under coercion. In light of our conclusion that the extradition court may consider allegations of coercion, even when they are included in a recantation statement, we think it best to return this matter to the extradition court for reconsideration. See, e.g., Caplan, 649 F.2d at 1343-45; Greci v. Birknes, 527 F.2d 956, 960-61 (1st Cir.1976); United States ex rel. D’Amico v. Bishopp, 286 F.2d 320, 321-23 (2d Cir.1961); Gill, 747 F.Supp. at 1046. Since this case is here on habeas and not on direct appeal, our mechanism for returning this case to the extradition court is necessarily circuitous, because “the proceeding before a committing magistrate in international extradition is not subject to correction by appeal.” Collins I, 252 U.S. at 369, 40 S.Ct. 347. We cannot issue or refuse the certification of extraditability; we can only order the release of the accused if there are no grounds for holding him, a judgment we are unwilling to make on the present record. As a result, we will remand the case to the district court with instructions to grant the writ of habeas corpus unless a judge or magistrate certifies Munoz’s ex-traditability within a reasonable time and *1009 after proceedings consistent with this opinion. See Shapiro, 478 F.2d at 914; Gill, 747 F.Supp. at 1046, 1050. “If the magistrate so certifies, the district court shall thereupon dismiss the petition, except it may entertain renewal thereof for adequate cause.” Greci, 527 F.2d at 961 (following Shapiro). “This somewhat cumbersome method of remand is needed because, owing to the collateral nature of habeas corpus review in an extradition proceeding, we have no direct power to vacate or modify the extradition court’s certification.” Caplan, 649 F.2d at 1345 n. 18 (citing Shapiro, 478 F.2d at 914).
The extradition court may consider the competency and sufficiency of the government’s evidence, exercise discretion as to the admission of Munoz’s proffered evidence, and consider any other evidence it deems necessary, consistent with our opinion. See, e.g., Greci, 527 F.2d at 960-61. Our decision does not foreclose a finding by the extradition court that the allegations of coercion are unreliable or insufficient to undermine probable cause or that Munoz is, in fact, extraditable. Rather, we simply decline to make these determinations in the first instance before the extradition court has had a chance to do so.
IV. CONCLUSION
We reverse the judgment of the district court and femand this case to the district court with instructions to discharge the petitioner unless, within 90 days, the extradition court certifies Munoz’s extradita-bility under 18 U.S.C. §3184 after proceedings consistent with this opinion. If the extradition court issues a certificate of extraditability to the Secretary of State, the district court shall dismiss the petition, subject to renewal for adequate cause.
REVERSED AND REMANDED.
APPENDIX
*1010 [[Image here]]
*1011 [[Image here]]
*1012 [[Image here]]
*1013 [[Image here]]
*1014 [[Image here]]
*1015 [[Image here]]
*1016 [[Image here]]
*1017 [[Image here]]
*1018 [[Image here]]
*1019 [[Image here]]
*1020 [[Image here]]
*1021 [[Image here]]
*1022 [[Image here]]
*1023 [[Image here]]
*1024 [[Image here]]
*1025 [[Image here]]
*1026 [[Image here]]
*1027 [[Image here]]
*1028 [[Image here]]
*1029 [[Image here]]
*1030 [[Image here]]
*1031 [[Image here]]
*1032 [[Image here]]
*1033 [[Image here]]
*1034 [[Image here]]
*1035 [[Image here]]

. We note that the extradition court’s opinion was originally reported as In re Extradition of Santos, 795 F.Supp.2d 966 (C.D.Cal.2011), and that the panel’s opinion was reported as Santos v. Thomas, 779 F.3d 1021 (9th Cir. 2015). This is incorrect. "Many Spanish names are composed of both the father’s and the mother’s family names, usually in that order, sometimes joined by y (and)_[Pier-sons with such names are usually referred to by both family names but sometimes by only one (usually, but not always, the first of the two family names), according to their own preference. It is never incorrect to use both." Chicago Manual of Style ¶ 8.11 (16th ed. 2010); see also United States v. Benitez, 34 F.3d 1489, 1497 n. 7 (9th Cir.1994) (discussing Hispanic naming conventions and citing the Chicago Manual). By way of example, Colombian Nobel Laureate Gabriel Garcia Márquez may be referred to as "Garcia” or "García Márquez,” but generally not as "Már-quez,” which is his mother’s maiden name. In his briefs, Munoz refers to himself as "Munoz,” not "Santos”; thus, this case is properly captioned as either Munoz v. Thomas or Munoz Santos v. Thomas. Ironically, the extradition court notes this naming convention in its opinion regarding Munoz’s release on bail— and still proceeds to refer to Munoz as "Santos.” In re Extradition of Munoz Santos, 473 F.Supp.2d 1030, 1042 (C.D.Cal.2006).
This naming convention appears to have caused a great deal of confusion among American courts generally. The Bluebook's guidance on this issue is unclear, noting that "if a party’s name is of Spanish or Portuguese derivation, cite the surname and all names following,” but without clarifying how a court is to determine what a person's surname actually is. The Bluebook: A Uniform System of Citation Rule 10.2.1(g), at 100 (Columbia Law Review Ass’n et al. eds., 20th ed. 2015). Likewise, legal research databases frequently get this wrong.
In the interest of allaying this confusion— and avoiding unintended consequences — we provide this explanatory note as guidance for ourselves and the lower courts.

. In October 2005, Hurtado gave a highly detailed, sworn statement to the Deputy District Attorney that told a very different story and which was not presented as part of the government’s evidence in the extradition court. In his October 2005 statement, Hurta-do stated that in early August before the kidnapping, he and two friends, El Pelón and El Sapo, had been smoking marijuana and made a plan to rob Hermosillo's house, because it "looked luxurious.” Hurtado knew the house because he worked as a carpenter nearby. El Pelón and El Sapo agreed and said they would give Hurtado 30,000 pesos to do the job. On August 18, at about 5:00 in the evening, Hurtado called El Sapo’s phone and asked him whether he was going to participate in the robbery as planned. El Sapo said yes and that he was planning to enter the house with someone named "Chonte.” At 8:00, Hurtado called a taxi, which he remembered was a white Atos, and went to Hermosillo's house. He stopped about two blocks away and called El Sapo again, who told him to wait until 10:00. When Hurtado called El Sapo again two hours later, he told him that he and Chonte were on the way to the house. Hurtado stated that he saw El Sapo’s light brown Ford truck drive by the house and assumed that all was going according to plan. Hurtado then told the taxi driver to take him to buy cocaine at a nearby motel known as the "Posada Real.” Hurtado and the taxi driver then drove back past Hermosillo’s house, where they did not see anyone.
Hurtado said they got about two blocks down the street before they were stopped by several cars driven by men. The men pulled Hurtado out of the taxi and put him in the backseat of one of the other cars and demanded "Where is the truck?” Hurtado said he didn't know anything and that he had only been in the area to drink beer. The men questioned him for about thirty minutes and then put him and the taxi driver in the backseat of another car, where they were told that the men were “investigating something awful that had happened.” Hurtado and the taxi driver were eventually released, and the taxi driver took Hurtado home.
Finally, Hurtado stated that he recognized a photo of Munoz that the District Attorney's Office showed him, and that he only knew Munoz by sight.

. In Mexican courts, witnesses are given an opportunity to accept, reject, or amend their preliminary or “ministerial” statements when they make their first appearances before the judge trying a case — the purpose being to weed out false or coerced confessions. See, e.g., In re Extradition of Garcia, 890 F.Supp. 914, 923-24 (S.D.Cal.1994) (explaining the procedure in Mexican courts).

. The district court's opinion is not published in any database. Because of its importance to this case, we have reprinted it in an appendix to this opinion.

. Because the Due Process Clause prohibits the use of coerced statements, including those obtained by torture, we need not address whether the Convention Against Torture would also prohibit the use in extradition proceedings of statements obtained under torture. See Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, art. 15, Dec. 10, 1984, 1465 U.N.T.S. 85.

. Belying the dissent’s assertion that "[f]or-eign governments seeking extradition are unlikely to let allegations of torture lie unanswered.” Dissenting Op. at 1046.

. Our extended discussion of Barapind rebuts the dissent's unfounded claim that we have "recantfed]” that decision. Dissenting Op. at 1043. Far from it: we have carefully explained why our decision here follows from our nuanced decision in Barapind.

. Nor does the rule of non-inquiry apply here: the long-standing principle that courts should refrain from inquiring into how an individual will be treated by a foreign state if extradited. In other words, the rule bars the judiciary from preventing the surrender of a fugitive on the basis of humanitarian considerations once extradition has been certified, reserving that decision to the Secretary of State. See, e.g., Hoxha, 465 F.3d at 563 ("[H]umanitarian considerations are within the purview of the executive branch and generally should not be addressed by the courts in deciding whether a petitioner is extraditable.”); Prasoprat v. Benov, 421 F.3d 1009, 1116 (9th Cir.2005) ("We have long adhered to the rule of non-inquiry — that it is the role of the Secretary of State, not the courts, to determine whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state.”); Blaxland, 323 F.3d at 1208 ("While potential abuses in the requesting country rising to the level of torture are reviewable by American courts ... judges generally refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely.”) (quotations omitted); Mainero, 164 F.3d at 1205 n. 6 ("The so-called 'rule of non-inquiry’ recognizes that ‘[a]n extradition court will generally not inquire into the procedures or treatment which await a surrendered fugitive in the requesting country.’ ”) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir.1983)); FJC Manual at 26 ("[Tjhe rule of non-inquiry reserves for the Secretary of State the task of assessing whether there are political or humanitarian grounds to deny extradition.”). The question we address in this case has to do with whether there is probable cause to extradite Munoz to Mexico, not how Munoz will be treated if he is removed to Mexico. Hence, the rule of non-inquiry is inapplicable.