**In the MATTER OF the EXTRADITION OF Jose Luis Muñoz SANTOS, a/k/a Jose Luis Hernandez Santos,**

**No. CV 06–5092 AJW**

United States District Court, C.D. California, Western Division.

Signed 01/09/2017

---

## MEMORANDUM AND DECISION

ANDREW J. WISTRICH, United States Magistrate Judge

### Procedural History

The United States (the "government") filed on behalf of Mexico a request for the extradition of Jose Luis Muñoz Santos ("Muñoz") in 2006. Unlike most requests for extradition, this one has not gone smoothly. See In re Extradition of Santos, 473 F.Supp.2d 1030, 1036 (C.D. Cal. 2006) ("Not only did a Mexican court invalidate the first arrest warrant, but the second arrest warrant, which was obtained after Mexican prosecutors had notice of the defi-

ciencies in the first warrant, also was invalidated."). Eventually, after numerous continuances and other delays, this court certified Muñoz for extradition. As discussed at length in that decision, the principal evidence establishing probable cause to believe that Muñoz committed the charged offense—kidnapping—consists of statements by Jesus Servando Hurtado Osuna ("Hurtado") and Fausto Librado Rosas Alfaro ("Rosas"), both of whom confessed to participating in the kidnaping and named Muñoz as a co-conspirator. See In re Extradition of Santos, 795 F.Supp.2d 966, 975–979 (C.D. Cal. 2011).

Muñoz filed a petition for a writ of habeas corpus, which was denied. Muñoz Santos v. Thomas, Case No. CV 11–6330 MMM. A panel of the Court of Appeals affirmed. Santos v. Thomas, 779 F.3d 1021 (9th Cir. 2015). Subsequently, the Court of Appeals, sitting en banc, reversed, holding that the extradition court should have considered Muñoz's evidence that the statements of Hurtado and Rosas were obtained by torture or coercion in determining whether probable cause existed. Santos v. Thomas, 830 F.3d 987 (9th Cir. 2016)(en banc).

The government now requests that this court recertify Muñoz for extradition to Mexico.

## Legal Framework

In Santos, the Court of Appeals held that "evidence that a statement was obtained under torture or other coercion constitutes 'explanatory' evidence generally admissible in an extradition proceeding," and that "[a]n extradition court may properly consider evidence of torture or coercion in considering the competency of the government's evidence, even when the claim of coercion is intertwined with a

recantation." Santos, 830 F.3d at 1005. Although the Court of Appeals made it clear that, "[i]f there is credible evidence that the statements were obtained by torture, then they are not competent evidence," Santos, 830 F.3d at 1006, it was less than clear about the standard to be applied in determining whether evidence of torture is "credible" or sufficient to undermine the competency of the government's evidence.

Not surprisingly, the parties have offered vastly divergent interpretations of Santos. The government argues that "if the allegation of torture is disputed by the requesting country and evidence presented by the fugitive does not conclusively establish the credibility of the allegations, the court's inquiry must end." [Docket No. ("Dkt.") 227 at 9]. Muñoz, on the other hand, argues that when a fugitive offers plausible evidence that a statement was procured by coercion, the requesting state should be required to introduce evidence refuting the allegation. [Dkt. 225 at 11]. According to Muñoz, the extradition court should adopt a standard that counsel asserts is employed by international courts presented with evidence allegedly obtained by torture—that is, if there is a "real risk" that evidence was procured though coercion, the extradition court must not consider such evidence. [Dkt. 225 at 11].[1] The court adopts neither analysis. Instead, it considers the evidence of coercion as follows.

 The government bears the burden of establishing extraditability, so the government must show, among other things, that there is competent evidence establishing probable cause to believe that the person named in the extradition request committed the charged offense. See

---

1. As authority for this assertion, Muñoz relies upon the amicus brief filed in the Ninth Circuit by Juan E. Mendez, United Nations Special Rapporteur on Torture, which discusses the use of the exclusionary rule for statements acquired by torture in "proceedings before international criminal tribunals." [9th Cir. Case No. 12–56506, Dkt. 75 at 14–15].

18 U.S.C. §§ 3184, 3190; Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008); In re Extradition of Santos, 795 F.Supp.2d 966, 969–970 (C.D. Cal. 2011). The proponent of evidence generally bears the burden of establishing its admissibility. See United States v. Chang, 207 F.3d 1169, 1177 (9th Cir. 2000) (stating that the proponent of evidence has the burden of proving the foundational requirements for its admission by a preponderance of the evidence); Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 598 (9th Cir.1996) (stating that the proponent of expert testimony "has the burden of proving admissibility"); Bemis v. Edwards, 45 F.3d 1369, 1373 (9th Cir. 1995) ("As the proponent of the [hearsay] evidence, Bemis had the burden of establishing personal perception by a preponderance of the evidence."); see generally Fed. R. Evid. 104. Further, in the context most analogous to this one— where the voluntariness of a confession is challenged—the Supreme Court has held that the government bears the burden of demonstrating by a preponderance of the evidence that the confession was voluntarily given. Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) ("[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered. Thus, the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); see also Colorado v. Connelly, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (before a custodial confession is admissible, the preliminary fact that the confessor waived his or her rights must be proved by preponderance of the evidence). Because the government bears the burden

of establishing that the evidence it proffers to this court is competent, it must show by a preponderance of the evidence that the statements of Hurtado and Rosas were not obtained by coercion.

## Evidence relevant to the allegations of coercion

### 1. Hurtado

The government relies upon a statement Hurtado gave on March 14, 2006 to a Deputy District Attorney in Tepic, Nayarit. In that statement, Hurtado said that in late July 2005, he ran into Jorge Gonzalo Lopez Chavez ("Lopez Chavez"), whom he had known for twenty years, and agreed to accompany Lopez Chavez to a paint store, where they met Rosas. [Dkt. 10 at 219]. The three men bought beers together, and then Lopez Chavez took Hurtado home. [Dkt. 10 at 220].

On August 3, 2005, Hurtado again met with Lopez Chavez, who again took Hurtado to meet with Rosas at the paint store. [Dkt. 10 at 220]. The three men bought beers together, and then went to a nightclub at the intersection of Zapata and Zacatecas streets. [Dkt. 10 at 220]. When the three men arrived at the nightclub, Muñoz, "alias El Pepe Munos," was waiting for them. [Dkt. 10 at 220]. Hurtado did not know Muñoz at that time. While the four men were drinking in the nightclub, Hurtado overheard Rosas ask Muñoz about "the job." [Dkt. 10 at 220]. As Lopez Chavez, Hurtado, and Rosas were leaving the nightclub, Hurtado saw Rocio Lopez Mendivil ("Lopez Mendivil"),[2] known to Hurtado as "Rosy," enter the nightclub. [Dkt. 10 at 220]. Hurtado thought that she intended to talk with Muñoz. [Dkt. 10 at 220]. When Lopez Chavez was driving Hurtado home,

---

**2.** Although one statement refers to Lopez Mendivil as "Rocio," the official court record of her case indicates that her name is Rosa

Esthela Lopez Mendivil. [See Dkt. 142–2 at 8 (filed under seal) ].

he asked what the "job" was, but Lopez Chavez did not answer. [Dkt. 10 at 220].

The next day, Hurtado went to Lopez Chavez's house to ask again about the "job" that Rosas referred to in the nightclub. Hurtado needed money and was curious. [Dkt. 10 at 220]. Lopez Chavez offered to take Hurtado to see Rosas, who could tell Hurtado what the "job" was. [Dkt. 10 at 220]. The two men met with Rosas at the same nightclub that night. [Dkt. 10 at 221]. Rosas asked Hurtado if he was up for a kidnapping, and Hurtado said yes, thinking that Rosas was kidding. [Dkt. 10 at 221].

On August 9, 2005, Hurtado met with Rosas again, who confirmed that the kidnapping plot was real, and assigned Hurtado a role in the scheme. [Dkt. 10 at 221]. Hurtado was designated to watch the house where the kidnapping was going to occur and to alert the others when the intended victim, a woman, arrived at the house. [Dkt. 10 at 221]. Rosas showed Hurtado pictures of the woman and her two daughters. [Dkt. 10 at 221]. Hurtado subsequently learned that the woman was Dignora Hermosillo Garcia ("Hermosillo"). Once Hurtado alerted the others that the victim had arrived home, Rosas was to enter the home, grab the victim, and put her in a black Nissan Altima. [Dkt. 10 at 220]. Rosas, Lopez Mendivil, and Muñoz would then drive the victim to a house Rosas had rented in Jolotemba. [Dkt. 10 at 220].

On August 18, 2005, Rosas and Lopez Chavez picked up Hurtado and told him to watch the house where the kidnapping would occur. [Dkt. 10 at 221]. Hurtado was instructed to call Rosas's cell phone when he saw the victim arrived home in a white SUV. [Dkt. 10 at 221].

When Hurtado saw the white SUV arrive at the house, he called Rosas from a pay phone. [Dkt. 10 at 222]. Then he went back to his position and watched as Lopez Chavez and Rosas drove up in front of the house. [Dkt. 10 at 222]. He saw Rosas, "hooded," enter the house, and then drive off at high speed with the victim and her two daughters in the victim's car. [Dkt. 10 at 222].

Hurtado further stated:

I want to add now that I read the statement rendered by JOSE LUIS MUNOZ SANTOS, alias EL PEPE MUNOZ, I state that these are all lies because he is presenting documents that aren't true and I say that because I identify him from the photographs of him in the file and because he did participate in that which I have stated and his witnesses are also lying, so is JORGE GONZALO LOPEZ CHAVEZ, alias EL PELON, as he also participated in the events and these two, together with ROCIO LOPEZ MENDIVIL AND FAUSTO LIBREADO [sic] ROSAS ALFARO, were the ones that planned everything that has happened.

[Dkt. 10 at 223]. Hurtado's statement concluded:

[T]his is all I wish to declare in the presence of my public defender, with no coercion, physical or moral violence on the part of this office or on the part of the officers of the state police, and that which I have stated is the truth of the events and because it is not my intention to harm more people, therefore I have stated the truth of the events, therefore this being all that the accused has to declare, following reading of his statement, he so confirms and signs before the Undersigned Deputy District Attorney, assisted by the official recorder with whom he acts and attests.

[Dkt. 10 at 224].

On March 22, 2006, Hurtado was brought to court to make a preliminary statement. Hurtado refused to ratify his

statements,[3] explaining that the statements were false, he did not know the persons named in the statements, he had nothing to do with the kidnapping, and that he signed the statements as a result of being tortured. [Dkt. 225–3]. Specifically, Hurtado told the court that on a Friday morning he was walking to work after dropping off his daughter at his mother's home, when he was grabbed from behind and forced into a gray truck. Hurtado described "the man who caught him" as "a potbellied, tall judicial police officer with short, wavy hair, and that's the man I recognize at first sight." [Dkt. 225–3]. A "cap" was placed over his head and he was driven to an unknown location where he was tortured for days. Hurtado was asked about the kidnapping and told to tell the truth. Hurtado was hit, his face was covered with a bag that was tightened so that he could not breathe, and he was placed on the floor while water was sprayed into his nose and mouth. Hurtado was shown photographs, but he did not recognize the people they depicted. At one point, Hurtado was able to remove the cap from his eyes and he saw that he was in a house with a bed and a closet. Hurtado heard coyotes. One morning his captors bound his feet with duct tape, wrapped him in a blanket and strapped a rope tightly around him. They told Hurtado that they were "going to give me my daughter in pieces."

When Hurtado said that he did not know anything, he was kicked in the stomach and he fell down. His captors informed Hurtado that if he said what they told him to say, they would let him talk to his family. Hurtado was taken to a man at a desk and he made a statement. Hurtado was told that if he spoke about what had happened to him, he would be hurt inside prison or his family would be hurt. After making his statement, Hurtado was told that he would be allowed to make a phone call, but he was not allowed to do so. Instead, he was blindfolded and placed back into the truck and returned to the unknown location where he had been held captive. [Dkt. 225–3].

Hurtado said that on the day before he was brought to court, he was finally taken to the public prosecutor's office. When he arrived, he saw that cameramen were present. The chief of the judiciary police instructed Hurtado that he must say what he previously had been told to say, and that he would be released in 15 days. [Dkt. 225–3].

At the conclusion of the March 22, 2006 court appearance, the clerk of court attested that bruises were observed on Hurtado's cheekbones, and that he complained about left earache and pain on his right foot. [Dkt. 225–3].

---

**3.** In addition to the March 14, 2006 statement, Hurtado also made a statement on October 12, 2005, in which he said that he had been watching the home where the kidnapping took place for days because it looked "luxurious," and that he proposed to two of his friends, El Pelon and El Sapo, that they "go in to steal things of value." [Dkt. 143–4 (filed under seal)]. El Pelon and El Sapo agreed, and told Hurtado that they would give him 30,000 pesos to do the job. Then, on the day of the kidnapping, Hurtado called El Sapo "to ask him if he was going to do the job that was to go into the residence located at calle Percebes number 61 ... in this city of Tepic to steal things like we had planned and then he told me yes and he was going to go with someone named CHONTE, and I left it at that ...." [Dkt. 143–4]. Hurtado took a taxi to the location, and at approximately 10:30 p.m., he saw El Sapo's truck and he believed that they were going to rob the house. He then told the taxi driver to take him to a motel where he bought cocaine. The taxi drove past the house where the kidnapping occurred, but Hurtado did not see anyone. Two blocks away, he was stopped. Some men placed Hurtado and the taxi driver in a car and asked them questions. About a half hour later, the men left Hurtado and the taxi driver. The taxi driver then brought Hurtado home. [Dkt. 143–4].

On May 25, 2006, Hurtado was brought to court in connection with proceedings against Lopez Mendivil. First, he affirmed under oath that his October 12, 2005 statement was "made under torture." Then he reiterated that he had been detained for twelve days prior to making his second statement, during which "bags were placed over my face, I was punched in the stomach, I received death threats, water was poured into my nose and mouth as I was lying on my back. All of this was in order to force me to tell them that I had participated in the incident, and that I knew these people." He could not recall the precise date on which this occurred, but he did remember that it was a Friday morning. Hurtado said that he did not know Lopez Mendivil, and that he only named her in his prior statement because he was forced to do so. [Dkt. 225-4]. At this proceeding, the representative of the district attorney's office asked: "Will the defendant state whether he has any authenticated document proving the torture and beatings which he stated that he suffered...." Hurtado answered, "How can I show you a document proving that I was beaten?" [Dkt. 225-4].

On November 21, 2006, Hurtado again appeared in court and testified under oath. He described, consistently and in detail, his treatment while held captive. In addition, Hurtado stated that on the date of the kidnapping, he had taken a taxi to Calle Percebes # 18, where he had been doing carpentry work, where the wife of Salvador Venegas paid him three hundred pesos for his work. He also stated that he had been threatened by Martin Lujan,[4] who said that he had orders from "the outside," and that Hurtado should not change his statement or he would be

killed. Hurtado said that he was afraid for his life and the lives of his family members. [Dkt. 225-5].

In a declaration signed on June 10, 2009, Hurtado summarized the events leading up to his statements and his recantation. According to Hurtado, he was first arrested one night when he went by taxi to collect money from a customer for whom he had performed carpentry work. The location of the customer's home was in the same neighborhood as the kidnapping. Hurtado was released soon thereafter. A few days later, he was again stopped by the police and taken to a room [5] where he remained for approximately eight hours. During that time, Hurtado was blindfolded, a plastic bag was periodically placed over his head, he was punched in the face and body "with hands," and he was forced to lie down while water was poured on his face "while [he] was trying to breathe." In order to stop the beatings, Hurtado told the police that he tried to rob the house and made up names and events. This resulted in Hurtado's October 12, 2005 statement. When he met with an attorney, he was told to sign papers indicating that when he was stopped by the police he had tried to bribe the officers, and that this admission would end the proceedings. Two days later, Hurtado was released. [Dkt. 225-6 at 1-2].

Nine months passed without incident before the morning when Hurtado was pulled into a truck after dropping off his daughter at his mother's home. His declaration describes what Hurtado estimated was twelve days of torture and the threat to kill his daughter, during which time the police brought the March 14, 2006 statement to him, which Hurtado signed without reading it. He believed that he was

---

4. Hurtado's statement identifies Lujan as an "inmate" in the detention center. [Dkt. 225-5 at 6].

5. Hurtado alternately refers to the place he was taken as the police station and the procuraduria or prosecutor's office. [Dkt. 225-6 at 2 & 5].

acknowledging his personal "full culpability"; he did not know that his statement implicated others in the crime. While still captive, Hurtado overheard a telephone call and learned that Rosas had been arrested. The chief of police then told Hurtado that he was "going to spare [Hurtado]'s life," that he should not tell anyone what had happened, and that they were taking him to the prosecutor's office where he was to say that he had been sent to watch the house for the arrival of the wife. When Hurtado arrived at the prosecutor's office, he saw Rosas and Lopez Mendivil, as well as "the press." [Dkt. 225–6 at 3–4].

Hurtado was taken to court and his statement was read to him. That is when he learned what was in his statement and heard the names of the people whom he supposedly had implicated in the kidnapping. Hurtado told the judge that the statement was "a lie," that he had signed the statement "under torture," that he was not involved in the crime, and that he did not know the people who were accused of the crime. [Dkt. 225–6 at 5].

### 2. Hurtado's brother and mother

Jose Alfredo Hurtado Osuna ("Jose") [6], Hurtado's brother, testified under oath on October 24, 2006. He stated that Hurtado dropped his daughter off at his mother's house every day before going to work. On what he believes to have been March 10, 2006, Hurtado dropped his daughter off, but failed to return. The family worried about Hurtado for three days. Then, on March 14, 2006, they went to the office of the district attorney to report his disappearance. They continued to search for him until eleven or twelve days later, when they saw him on television. He appeared to have been beaten up. When they saw him in person three or four days later, Hurtado's face was still bruised and swollen. Jose also said that Hurtado had to have

surgery on his appendix and had trouble with his hearing as a result of the beatings. [Dkt. 225–8].

Finally, Jose stated that he and Hurtado had ben performing work on a house in the neighborhood of the kidnapping, and that around the time of the kidnapping, Hurtado went back to the house to collect money. [Dkt. 225–8].

On October 24, 2006, Rosa Elena Sanabia Osuna ("Sanabia"), Hurtado's mother, also testified under oath. Sanabia stated that at 7 a.m. on March 10, 2006, Hurtado dropped off his daughter at Sanabia's house but never returned. The family searched for him for several days, and then reported his disappearance. On March 21, 2006, she saw Hurtado on the news, and he looked swollen and beaten. The following day, Sanabia went to see Hurtado, and he still looked swollen. He also had trouble with his hearing. Hurtado told Sanabia that he had been beaten. After he had been detained for a month, he had surgery on his appendix. [Dkt. 225–8].

### 3. Rosas

The government relies upon Rosas's March 27, 2006 signed statement which was submitted to a judge. In that statement, Rosas said that he had known Muñoz for "some years" because they had a business buying and selling clothes. In July 2005, Muñoz told Rosas that he was planning a "job" and that he and Rosas should meet in Tepic, Nayarit "in order to go into detail." [Dkt. 10 at 354–355]. Rosas was interested, so in mid-July, he went to Tepic and met with Muñoz, Hurtado, Lopez Chavez, and Lopez Mendivil to discuss the job. [Dkt. 10 at 354–355].

Some days later, Rosas, Muñoz, Hurtado, and Lopez Chavez gathered "in the discotheque located at Zapata and Zacate-

---

**6.** Because he shares a last name with his brother, the court refers to Jose by first name.

cas Streets" to "get into detail so that nothing went wrong." The meeting lasted "[s]ome hours." Among the details discussed was "the amount that should be demanded of the Castellano Hermosillo" family. Hurtado, who was sometimes referred to as "Negro," was asked if he wanted to participate in the "job." Rosas believed that Hurtado "thought we were joking because he laughed and did not answer." [Dkt. 10 at 355].

After leaving the discotheque at about 11 p.m., Rosas and Muñoz "ran into" Lopez Mendivil, Rosas's former sister-in-law. Lopez Chavez and Hurtado had already left. Muñoz and Lopez Mendivil spoke together outside Rosas's presence. Muñoz "gave her instructions to what she had to do, and it was to take care of the Mrs."— meaning the intended victim, Hermosillo— until the ransom was paid. [Dkt. 10 at 355].

The following night, Rosas, Muñoz, Lopez Chavez, Lopez Mendivil, and Hurtado gathered in the same discotheque to continue talking about the "job." By then, Hurtado had accepted the offer to participate. Rosas claimed that Muñoz was investigating "Mrs. Dignora's" family, but Rosas did not know what sources of information Muñoz used because he did not say. However, Lopez Chavez worked for a paint store owned by Rosas's former father-in-law, and he frequently took paint buckets to a kindergarten attended by "one of the girls" on Paraiso Street, Colonia San Juan, "so he already knew her, and he had been checking the routes of the family because they went to pick up the girl." [Dkt. 10 at 355]. According to Rosas, Lopez Chavez also took several pictures of "the girl," as well as of the vehicle driven by Hermosillo. [Dkt. 10 at 355].

On August 9, 2005, Muñoz, Lopez Chavez, Lopez Mendivil, Hurtado, and Rosas met again. Rosas told Hurtado that according to Muñoz, aka "Pepe," Hurtado's role in the "job" was to check the family's house and to let the others know when "a lady in a white van arrived" home. [Dkt. 10 at 355–356].

On August 18, 2005, Hurtado carried out his assigned role by taking a taxi to a spot where he could watch Hermosillo's home. [Dkt. 10 at 356]. At around 9:30 p.m., Hurtado informed the others that Hermosillo had arrived home with her two daughters in a white Jeep Cherokee. Rosas entered the home and hid behind a door. Meanwhile, Muñoz and Lopez Mendivil were driving elsewhere in a car that "should have been used to transfer" Hermosillo "to the place where we would keep her until the ransom [was] collected." [Dkt. 10 at 356].

Wearing a black ski mask, Rosas confronted Hermosillo and threatened her with a square-shaped, .38 caliber pistol. He told her not to be scared and that nothing would happen to her, and he put her in her car. Rosas was supposed to take only Hermosillo, but he got nervous, so he also put the girls in the car. Hermosillo opened the garage door, Rosas drove the car into the street, and Hermosillo closed the garage door. He drove to the beltway and headed in the direction of Jalcocotan. As they were driving, Rosas asked Hermosillo which routes her husband took to return to the city, and she replied that she did not know. Rosas received a cell phone call from Muñoz, who told him to let the girls out and leave them together at a place close to the fishermen, in the area of Tapada de Platanitos. Rosas headed toward Platanitos, but then argued with Muñoz on the cell phone because "I was going to leave the kidnaped persons in the wrong place . . . ." [Dkt. 10 at 356]. Rosas drove fifteen minutes more, then let the girls out of the car separately. He left them both bound hand and foot. [Dkt. 10 at 357].

Muñoz called and complained that Rosas had not done what they had agreed. Rosas explained that he got nervous, and he asked Muñoz what to do. Muñoz said that either Lopez Chavez or "Carpintero" would pick up the girls and take them to a safe place where Lopez Mendivil was waiting, because Rosas had left them in the wrong place. He also told Rosas to take Hermosillo's cell phone in order to call her husband and demand the ransom. Rosas left Hermosillo bound hand and foot by a tree. [Dkt. 10 at 357].

Rosas drove back to Tepic in Hermosillo's car. He met with Muñoz in the town of Aguacate and gave him Hermosillo's cell phone. While Rosas was there, at about noon on August 19, 2005, Muñoz used the phone to call Hermosillo's husband. Muñoz told Castellanos that his family had been kidnapped and demanded money in exchange for their freedom. When the phone call was completed, Rosas and Muñoz left in Muñoz's green Toyota van. [Dkt. 10 at 357]. Muñoz continued making phone calls, and Rosas did "not know why they did not pick up the girls from the place where I left them, because the plan was to take them to a rented house to take care of them." [Dkt. 10 at 357]. Muñoz started "arguing hard" with another accomplice—Rosas did not know who it was—and afterwards told Rosas that they were in terrible trouble, but that he would solve it. However, Muñoz disappeared and went to the city of Hermosillo, Sonora. [Dkt. 10 at 357]. Rosas said that "we did not mean to hurt anybody, and least to deprive someone of life." [Dkt. 10 at 357].

On May 25, 2006, Rosas, represented by a public defender, appeared before a criminal court judge, and testified under oath. Rosas recanted his March 27, 2006 statement. Rosas explained that he had been forced to sign the statement because he had been beaten and threatened with harm to his wife and family. Rosas also said he had been forced to appear before the media and declare himself guilty. [Dkt. 225–1].

On June 20, 2006, Rosas again appeared in court and testified under oath. He stated that on March 20, 2006, he was detained and taken to the district attorney's office. Rosas said that he found out about the kidnapping "incident" from "Pepe Muñoz," who called Rosas to tell him that Muñoz had implicated both of them in a statement he made to the judicial police after being tortured. Muñoz also told Rosas that he subsequently had given a statement to the district attorney's office denying their involvement. When Rosas told the truth—specifically that he did not know anything about the kidnapping and that Muñoz had said that he implicated Rosas only because he was beaten—Rosas was taken to a "sort of cell, without lights, and with only a chair." His legs were bound to the chair, and his hands were bound behind him. A bag was placed over Rosas's head and he was struck with an open hand on his chest. Rosas was told to tell the truth about the incident, and he was asked questions. He finally gave answers based upon things he'd seen in the file, like "they'd taken the lady's car;" and "they had gone in the direction of Jalco," but these things were not true. Rosas gave answers only to stop the torture. The following morning, the commander told Rosas that they were going to a press conference, and told Rosas what to say. The commander threatened Rosas by telling him that if he did not say what he was told to say, he would be sorry because "after all, I have three days to turn you over." [Dkt. 225–2 at 3, 5–6].

Rosas also said that he had been beaten and threatened in jail by Martin Lujan, whom he identified as "the General Director." Lujan told Rosas to help him by signing the statement and said that if he did not, something bad would happen to

Rosas and his family. Lujan mentioned that Rosas's wife and son had arrived in a black Altima, suggesting to Rosas that something serious could happen to them if he did not cooperate. Lujan told Rosas that the father of the victims was calling and pressuring him. [Dkt. 225–2 at 3, 5].

Finally, Rosas testified that he signed the statement, but that the contents were not read to him before he did so. When he was in court, he affirmed that the signature was his, but repudiated the contents of the statement. [Dkt. 225–2 at 3, 5–6].[7]

### 4. Muñoz

On September 9, 2005, Muñoz was detained at a bus station in Tepic and brought to the prosecutor's office to make a statement. According to a "Report of Presentation," dated September 10, 2005 and presented by the Tepic police, Muñoz told the police that on August 17, 2005, he called Rosas on the phone and asked to see him the following day. On August 18, 2005, Muñoz met with Rosas, "El Pelon," and Rogelio Perez.[8] At the meeting, he told Rogelio Perez to "get the lady." "El Pelon" was going to wait in Santiago for Rogelio Perez. Meanwhile, Muñoz and Rosas went to a restaurant to eat. At 6:00 p.m., Rogelio Perez called Rosas and told him that "he was doing what he had been sent to do." At about 11:00 p.m., Rosas received another phone call from Rogelio Perez, who said that he had gone to San Blas with "the lady," to which Rosas responded "that that is not what had been decided

and they started to argue on the phone...." When Muñoz asked Rosas what had happened, Rosas said that "Rogelio wanted to do what Rogelio wanted to do." Muñoz and Rosas then began to argue. Rosas let Muñoz out of the truck, "swearing at him and telling him not to get involved in his affairs," so Muñoz went home. [Dkt. 143–4 at 41 (filed under seal)].

On September 10, 2005, Muñoz was brought to court where he testified under oath. When his statement was read aloud, Muñoz renounced it, explaining that he knew nothing about the kidnapping, and only gave a statement because he had been to tortured by law enforcement. Muñoz testified that he had been arrested the previous day and brought to a police station. At the police station, law enforcement agents placed a bag over Muñoz's head. The agents also threatened his family, telling Muñoz that they were going to show a photograph of him to the father of the girls so that the father would know who Muñoz was and "he could take revenge." According to Muñoz, he knew Rosas because he distributed clothes to him. However, he did not see Rosas on August 17 or 18, 2005. Muñoz claimed that he was in Guadalajara, Jalisco (which is approximately 100 miles away from Tepic) with his wife and three children from August 17 though August 21, 2005.[9] He provided the name of the hotel in which they stayed on August 18, 2005. Muñoz denied knowing anyone with the nickname El Pelon. Al-

---

7. During this testimony, Rosas also provided details about his whereabouts during the time of the kidnapping. According to Rosas, he was in the city of Hermosillo from August 15, 2005 though at least August 18, 2005, where he attended the funeral of his mother-in-law and worked on a remodel of a commercial building. He received a Western Union transmission of money on August 18, 2005, and had documentary evidence that he received the money at a Western Union office in downtown Hermosillo. [Dkt. 225–2 at 4–5].

8. Neither Hurtado nor Rosas mentioned that Rogelio Perez was involved in the kidnapping.

9. Other evidence, including hotel receipts, show that Muñoz and his wife, Alicia Estrada, checked into the Malibu Hotel in Guadalajara at 7:00 p.m. on August 18, 2006. [See Dkt. 145–6 at 1–14 (filed under seal); see also Dkt. 145–5 at 43–45 (filed under seal)].

though Muñoz knew someone named Rogelio, he did not know his last name. [Dkt. 143–3 at 47 (filed under seal)].

The same day that Muñoz appeared in court, an order was issued requiring "two experts in the field of forensic medicine be appointed to carry out a physical examination and evaluation of [his] injuries." [Dkt. 145–4 at 10–11 (filed under seal)].

One report, dated September 10, 2005 states that Muñoz "displayed the following physical injuries, apparently sustained recently:" (1) hematoma measuring 3 cm located on the middle third of his right arm; (2) multiple hematomas located on the left middle face of his left arm; (3) ecchymosis measuring 1 cm in diameter located on the proximal third of his left arm; (4) scrape measuring .5 cm located on the interior of his lower lip; an (5) edema on the bridge of his nose. [Dkt. 145–4 at 26 (filed under seal)].

The second report, dated September 13, 2005, noted that Muñoz reported that he had been attacked and "tortured four days ago," having received "trauma to the head, neck torso, and extremities." The examination revealed numerous contusions, a laceration of the lower lip, and "inflamed conjunctiva," and concluded: (1) Muñoz "presents signs of injures caused by or originating from contusions"; (2) the evolution of the healing of the injuries corresponds to the date the patient states they were caused; and (3) "the chronology and seriousness of the patient's injuries are of the type which take less than two weeks to heal, and do not endanger the life of the patient." [Dkt. 145–4 at 19–20 (filed under seal)].

On September 30, 2005, Muñoz filed a request for amparo,[10] seeking protection of the federal court from further interrogation, torture, or threats by the prosecutor or law enforcement. He reiterated that he had been detained by law enforcement on the night of September 9, 2005 and taken to a police station, where a blindfold was placed over his eyes, he was placed on a chair, his hands and feet were tied, and he was directed to tell them about "the little girls and the lady." When Muñoz replied that he did not know anything, a bag was placed over his face, he was held back by the shoulders, his legs were grabbed so that he could not move, and his mouth was covered to suffocate him with the bag over his head. They did this several times until Muñoz "would lose consciousness and they would slap me to wake me up and continue torturing me, that happened throughout the night." In the morning, Muñoz was told that he would be "very sorry" because the police "would go to my in-law's house and they would forcefully take out my wife and my children and harm them." At this point, and to avoid further torture, Muñoz told them he would say whatever they wanted me to say. [Dkt. 143–1 at 13–16 (filed under seal)].

Muñoz submitted his September 25, 2009 declaration, in which he again describes his arrest and the methods used against him throughout the night of September 9, 2005. Muñoz states that he was blindfolded, and that his hands were bound behind a chair. A plastic bag was placed over his head and a hand was placed over his neck and his mouth. He was held by the shoulders and feet. Most of the time, the bag would be removed just before he

---

**10.** "Although the amparo is a highly complex legal institution ..., it is somewhat similar to habeas corpus and, inter alia, is the means to review and annul unconstitutional judicial decisions.... [¶] Like habeas corpus, the amparo has a more limited scope than an appeal and determines whether the contested act violated a petitioner's *constitutional* rights." United States v. Fowlie, 24 F.3d 1059, 1064 (9th Cir.1994)(emphasis in original)(internal citations omitted); see also Extradition of Santos, 473 F.Supp.2d at 1033 n. 2.

was about to "go unconscious," though he did pass out at least twice. He was hit in the stomach and chest by fists covered with wet rags. He was asked about the kidnapping, and he was questioned about Rosas and shown Rosas's criminal record. When Muñoz truthfully told his interrogators that he did not know about the kidnapping, they continued to hit and "smother" him. Finally, after he learned that the police were at the home of his in-laws and might hurt or arrest his family, Muñoz told the police that he would say whatever they wanted him to say. He was told what to say. In particular, Muñoz was told to say that the kidnapping plan was discussed at a restaurant; that the kidnapping did not go well; that he heard "Rogelio" arguing on the phone, and that he told Rosas to calm down. He said these things "on video" at about 6:00 a.m. on September 10, 2005. When Muñoz was taken to see the prosecutor, he renounced his prior statement and told the prosecutor that his statement was the result of physical torture and threats of harm to his family. [Dkt. 143–1 at 8–11 (filed under seal)].

### 5. Declaration of Victor Clark–Alfaro

Muñoz submitted the declaration of Victor Clark–Alfaro, a professor and the founder of the Centra Binational de Derechos Humanos in Tijuana, Mexico. According to Professor Clark–Alfaro's research,[11] coerced confessions were the primary evidence in many criminal convictions. In 2012, a survey by the Center for Economic Research and Teaching found that 57.2% of prisoners in federal prisons in Mexico reported that they had been beaten during detention, and 34.6% indicated that they had been forced to sign confessions or modify their statements. The percentage of prisoners tortured increases "drastically" when municipal and state prisoners are included in the data. Although torture is illegal in Mexico, and despite government pledges and efforts to curb it, police continue to use dozens of torture methods. Professor Clark–Alfaro notes that the report of the National Commission of Human Rights reveals numerous similarities in the testimony of torture victims. In particular, victims of police torture have been detained by people in civilian clothes, sometimes hooded, driving unidentified cars, and without a warrant. Victims are driven blindfolded to unknown sites where they are tortured. Typical torture methods include beating with fists, feet, and sticks; asphyxiation with plastic bags; water boarding; and threats. Victims are then presented to the media as criminals. Further, based upon fear of reprisal by Mexican officials, victims often do not report torture while in custody. Finally, Professor Clark–Alfaro concludes that the allegations of torture in Muñoz's case are consistent with the pervasive use of torture and the political dynamic in Nayarit, Mexico, during 2006. [Dkt. 225–7].

### 6. United States Department of State Report on Mexico

The 2006 U.S. Department of State Report on Mexico ("Report") states:

Although the government generally respected and promoted human rights at the national level by investigating, prosecuting, and sentencing public officials and members of the security forces, a deeply entrenched culture of impunity and corruption persisted, particularly at the state and local level. The following human rights problems were reported:

---

11. Professor Clark–Alfaro's conclusions are partially based upon and supported by a report by the National Commission for Human Rights and the Special Rapporteur on Torture. [See Brief of Amicus Curiae Juan E. Mendez, filed in Ninth Circuit Case No. 12–56506, Dkt. 75].

unlawful killings by security forces; kidnappings, including by police; torture; poor and overcrowded prison conditions; arbitrary arrests and detention; corruption, inefficiency, and lack of transparency in the judicial system; statements coerced through torture permitted as evidence in trials....

[Dkt. 225–9 at 2].

Among other things, the Report also notes that: (1) in several cases of reported disappearances, police had detained the missing person incommunicado for several days; (2) although the law prohibits it, torture continued to be a serious problem; (3) despite the law's provisions to he contrary, confessions obtained by torture often were admitted as evidence; (4) authorities continued to use torture with near impunity in large part because confessions were the primary evidence in many criminal convictions; and (5) human rights groups linked torture to the pervasiveness of arbitrary detention, since police and prosecutors often attempted to justify an arrest by forcibly securing a confession to a crime. [Dkt. 225–9 at 4].

### 7. Maria Teresa Lopez Chavez

In her declaration, which was signed in 2010, Maria Teresa Lopez Chavez ("Maria Lopez Chavez") states that she is the sister of Lopez Chavez. Lopez Chavez lived with Maria Lopez Chavez and her husband in Tepic, Nayarit, Mexico. In January 2006, the police arrested Lopez Chavez and kept him in custody for 24 hours. When he returned home, Lopez Chavez had "changed a lot." Lopez Chavez became withdrawn, and he was afraid to leave the house. He stopped sleeping in his bedroom and slept under the dining room table. He told Maria Lopez Chavez that the police had covered his face with a plastic bag, put

water in his mouth while he gasped for air, and beat him repeatedly. Maria Lopez Chavez saw bruises and markings on him. The police accused Lopez Chavez of being involved in the kidnapping and murder, and told him that he and his family should be careful because they were going to be killed. They tried to convince Lopez Chavez to confess to being involved in the kidnapping and to implicate Rosas as well as others. The police came to her house and took Lopez Chavez away on March 14, 2006. Maria Lopez Chavez has not seen him since. [Dkt. 225–10].

### 8. Lopez Mendivil

In their statements, Hurtado and Rosas both implicated Lopez Mendivil. Lopez Mendivil was prosecuted for her alleged role in the kidnaping and murder. The record contains evidence that Lopez Mendivil has been "absolved" of the charges. [Dkt. 142–2 at 8 (January 16, 2007 order of the Appeals Court "absolving" Lopez Mendivil, stating that "her guilt has not been proven," and ordering her released from custody) (filed under seal) ].

### 9. Diplomatic Note and Affidavit by the Public Prosecutor

The government filed a diplomatic note from the Embassy of Mexico dated July 23, 2009, which, in turn, includes several documents, including the sworn statement of Haydee Chavez Sanchez ("Chavez Sanchez"), a federal prosecutor who states that "there aren't sufficient elements available to bestow evidentiary value on the retractions of Fausto Libra do Rosas Alfaro and Jesus Servando Hurtado Osuna." [Dkt. 112, Exhibit ("Ex.") 1 at 3 (unofficial translation) ].[12]

---

**12.** The pages of the government's Notice of Submission, Docket No. 112, contain several different page numbers. To avoid confusion, the Court refers to the exhibit number and the handwritten numbers found on the bottom of each page.

In her affidavit, Chavez Sanchez, whose duties are "to carry out and monitor international extradition proceedings filed by the Mexican government," states that based upon the records comprising the formal extradition request, "it is proven that JOSE LUIS MUNOZ SANTOS has different co-perpetrators like Jesus Servando Hurtado Osuna and Fausto Libra do Rosas Alfaro amongst others." [Dkt. 112, Ex. 2 at 5]. Chavez Sanchez then summarizes Hurtado's statements, including his October 12, 2005[13] statement in which he said that on the day of the kidnapping, he took a taxi and watched the house inhabited by the victim and her daughters because he wanted to rob the house, and his March 14, 2006 statement in which he claimed that the first statement was not true, confessed to participating in the kidnapping, and implicated Muñoz. Chavez Sanchez notes that in Hurtado's preliminary statement to the court, he retracted both of his prior statements and claimed that they were the result of torture. Nevertheless, Chavez Sanchez explains that the judge hearing the case considered that "there were elements to prove his alleged responsibility in the commission of the criminal actions investigated... thus, the Judge issued the formal imprisonment order against him; therefore he is currently detained and subject to process." [Dkt. 112, Ex. 2 at 5–6].

Chavez Sanchez states that Rosas's written confession implicating Muñoz was presented to the judge on March 27, 2006.

Chavez Sanchez notes, however, that when Rosas was brought before the court for the first time on May 25, 2006, he "reserved his right to declare and answer questions," and therefore Rosas did not present "any alibi or reference to state where and with whom he was the day the events took place."" [Dkt. 112, Ex. 2 at 6]. Nevertheless, as Chavez Sanchez recognizes, when Rosas was brought to court on May 25, 2006, he recanted his March 27, 2006 statement and claimed that it was the result of torture. [Dkt. 112, Ex. 2 at 6–7].[14]

Chavez Sanchez asserts that the judge hearing the case issued a formal imprisonment order, from which she infers that there was sufficient evidence to prove that Rosas is criminally responsible.

With respect to the allegations of torture, Chavez Sanchez states neither Jesus Servando Hurtado Osuna nor Fausto Libra do Rosas Alfaro filed any complain before the Public Prosecutor or the Human Rights Commission from which it may be observed that they were indeed victims of torture. Hence, there is no evidence against the existing charges attributed to JOSE LUIS MUNOZ SANTOS as co-perpetrator in the commission of the criminal conducts under investigation.

[Dkt. 112, Ex. 2 at 7]. Chavez Sanchez adds that "it is important to state that those alleged psychological and physical tortures argued by Jesus Servando Hurtado Osuna and Fausto Libra do Rosas Alfa-

13. Chavez Sanchez's affidavit indicates that Hurtado's first statement was made on October 12, 2006. The Court assumes that this is a typographical error and she intended to refer to the October 12, 2005 statement.

14. The translation of Chavez Sanchez's affidavit actually states the following regarding Rosas's recantation: "However, he did presented [sic] any alibi or reference to state where and with whom he was the day the events took place (exhibit 2)." Exhibit 2 is Rosas's

May 25, 2006 appearance before the court in which he testified that he was forced to sign his written statement. He was not asked and did not offer any information about an alibi. Accordingly, it appears that Chavez Sanchez's affidavit includes a typographical error and was intended to state that Rosas failed to offer such evidence. This makes sense because Chavez Sanchez's point is that Rosas, who provided an alibi in his June 20, 2006 statement, lacks credibility in light of his failure to do so at his first opportunity.

ro, were not demonstrated at any moment either within or out the process; given that the period for offering evidence within the criminal process is concluded." [Dkt. 112, Ex. 2 at 8]. Chavez Sanchez adds that expert opinions about the physical and psychological condition of Hurtado and Rosas as of March 21, 2006 indicate that both men were "all right without presenting any bodily injury or mental disorder." [Dkt. 112, Ex. 2 at 8]. Chavez Sanchez concludes:

> Therefore, Fausto Librado Rosas Alfaro and Jesus Servando Hurtado Osuna have not offered within the criminal process, any evidentiary element to demonstrate the veracity of their statement regarding the alleged torture they were victims of and which made them render their statement against JOSE LUIS MUNOZ SANTOS. Hence, it is deduced the afore cited co-defendants recanted their statements as a legal strategy for their defense.

[Dkt. 112, Ex. 2 at 8]. Chavez Sanchez does not discuss Muñoz's allegations of coercion.

The reports Chavez Sanchez refers to consist of (a) a "Preliminary Psychological Analysis" report and (b) an "Injury Report", one for each Hurtado and Rosas, both dated March 22, 2006, the day after they were admitted to prison. The psychological analysis reports both state that Hurtado and Rosas were "nice and cooperative," oriented to time and place, "without apparent mind disorder," and "absent or minimum symptoms, correct activity in all areas." [Dkt. 112, Ex. 3 at 24, 26]. Save for a single sentence which references prior medical history, the injury reports of Hurtado and Rosas are identical. Both indicate

that the subject was calm, "showing good color and hydrated skin tegument, well conformed and with all its parts. . . ." [Dkt. 112, Ex. 3 at 23, 25]. The reports indicate that a physical examination of the skull, eyes, nose, mouth, neck, thorax, abdomen and limbs revealed normal results and that both men were diagnosed as "sane." [Dkt. 112, Ex. 3 at 23, 25].

**10. Letter from Legal Attache**

The government submitted a letter from Alfonso J. Motto–Allen, the legal attache at the Mexican embassy in Washington, D.C. [Dkt. 222 at 13; Dkt. 222–1].[15] The letter states that the "Mexican government disputes [Muñoz]'s allegations that the statement rendered by [Muñoz]'s co-conspirators, presented by Mexico in support of his extradition were obtained by any form of coercion, such as torture." [Dkt. 222–1]. The letter also notes that "[t]here are no records or any complaint, investigation or prosecution or court findings in Mexico, supporting such allegation[s]." [Dkt. 222–1].

**Analysis**

██ The evidence that the statements of Hurtado and Rosas implicating Muñoz were obtained by coercion is detailed. Hurtado and Rosas each made specific allegations about their mistreatment by Mexican law enforcement. See Santos, 830 F.3d at 1002 (observing that the statements of both Hurtado and Rosas did not consist of conclusory assertions, but rather contain "quite detailed" allegations). Each of the statements are internally consistent. Further, both Hurtado and Rosas made multiple statements about the coercion that allegedly caused them to make their initial

---

15. The letter submitted by the government is a copy. The government represented that the letter was "in the process of being sent thorough the formal diplomatic channels," and that the formal letter would be submitted once the government received it. [Dkt. 222 at 14 n. 8]. That formal letter has not been provided to the Court. Nevertheless, the court relies on the government's sponsorship of the letter and assumes that the letter is authentic.

inculpatory statements, and all of these statements remained consistent over time. Detail and consistency are indicia of reliability. See United States v. Hall, 419 F.3d 980, 987 (9th Cir.) (finding a statement to be "corroborated by the consistency with which she reported the events of the evening to multiple people shortly after the incident"), cert. denied, 546 U.S. 1080, 126 S.Ct. 838, 163 L.Ed.2d 714 (2005) ; United States v. Henderson, 721 F.2d 662, 666 n.1 (9th Cir. 1983) ("Detail is an indication of reliability.").

Lending further credibility to the evidence of coercion is the fact that the allegations were made at the first opportunity that Hurtado and Rosas were outside the control of the police or captors and in open court before a judge. The inculpatory statements upon which the government relies were given to prosecutors or police, but were not made in a public courtroom before a judge. See Santos, 830 F.3d at 1002 (noting that Hurtado gave his inculpatory statement to a deputy district attorney in Mexico and Rosas submitted his statement in writing to the judge presiding over his case). As soon as they were brought to court to affirm their statements, both immediately repudiated them and told the judge that the statements were given only because they were tortured and threatened.

Hurtado's allegations of coercion are also corroborated, at least to a degree, by a court clerk who observed bruises on March 22, 2006. Hurtado's allegations are further corroborated by his mother and brother who observed bruises and swelling sometime around March 21, 2006. See Hall, 419 F.3d at 987–988 (explaining that the reliability of a victim's hearsay statement was enhanced by documented physical bruising).

Not only are Hurtado's and Rosas's accounts of mistreatment similar to each other, but they are corroborated by the evidence that Muñoz also was subjected to similar mistreatment. Particularly striking is the evidence that Muñoz was taken into custody, suffocated with a bag over his head, beaten, and threatened until he agreed to make a statement that satisfied the police. Then, as soon as he was outside of the control of his captors, he renounced that statement and reported the coercion. Muñoz's testimony under oath was then immediately corroborated by medical examinations. The methods the police allegedly applied to coerce a statement from each of the three men were similar, but not identical. Although it is conceivable that Hurtado, Rosas, and Muñoz might have coordinated their coercion allegations, there is no evidence that they did so.

Additional support is found in the declaration of Maria Lopez Chavez—whose account of what happened to Lopez Chavez is similar to the accounts of Hurtado, Rosas, and Muñoz. This constitutes circumstantial evidence suggesting that in investigating the kidnapping, the Mexican authorities used coercive techniques to obtain unreliable statements in an effort to convict the perpetrators. Even the government concedes that this evidence corroborated Hurtado's and Rosas's allegations of coercion. [See Dkt. 236 (Transcript of proceedings December 6, 2016) at 20–21].

Finally, the overall credibility of the evidence of coercion is enhanced because it fits the practice of Mexican police in Nayarit in 2005 and 2006 as recognized by the Department of State and Professor Clark–Alfaro. [See Dkt. 225–7 & 225–9]. See Cornejo–Barreto v. Seifert, 218 F.3d 1004, 1008 (9th Cir. 2000) ("To support the credibility of his testimony, Cornejo–Barreto introduced evidence at the extradition hearing demonstrating that the torture he suffered is consistent with reports of torture in Mexico published by the U.S. De-

partment of State and by Amnesty International."), overruled on other grounds, Trinidad y Garcia v. Thomas, 683 F.3d 952 (9th Cir. 2012); see generally, Konou v. Holder, 750 F.3d 1120, 1125 (9th Cir. 2014) ("U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations.") (quoting Sowe v. Mukasey, 538 F.3d 1281, 1285 (9th Cir. 2008)) (internal quotation marks omitted); Nuru v. Gonzales, 404 F.3d 1207, 1219 (9th Cir. 2005) (examining the State Department's country report for Eritrea, acknowledging that "[i]t is well-accepted that country conditions alone can play a decisive role in granting relief under [the Convention Against Torture]," and noting that Eritrean country report described major human rights violations committed by members of the military and police, including that "Eritrean police occasionally resort to torture and physical beatings of prisoners. . . ."). Evidence that the same sort of abuses alleged by Hurtado and Rosas are "rampant" makes their allegations more plausible.

■ There are, of course, circumstances that tend to undermine the credibility of the coercion evidence. Ordinarily, the fact that a statement is a recantation or is self-serving tends to diminish its credibility. See, e.g., United States v. Jimenez–Ortiz, 611 Fed.Appx. 432, 433 (9th Cir. 2015) ("The district court was not required to accept Jimenez–Ortiz's self-serving statements as true, especially in light of evidence undermining his credibility, including shifting accounts about his border crossing the week before the instant offense."), cert. denied, —— U.S. ——, 136

S.Ct. 1232, 194 L.Ed.2d 228 (2016); Carriger v. Stewart, 132 F.3d 463, 483 (9th Cir. 1997)(Kozinski, J., dissenting)("Recanting testimony has long been disfavored as the basis for a claim of innocence" and is viewed, on review, "with extreme suspicion."); Barinaga v Cox, 2007 WL 184687, at *8 (D. Or. Jan. 12, 2007)("Because there is no independent, contemporaneous evidence corroborating the self-serving statements in the affidavit, the statements are not reliable and do not provide a basis for granting the motion to vacate. . ."), aff'd, 321 Fed.Appx. 664 (9th Cir. 2009). Here, the allegations of coercion were self-serving because they were made as part of a recantation in the context of a criminal proceeding and, if believed, those allegations would assist Hurtado, Rosas, and Muñoz in avoiding criminal liability.[16] But that does little to detract from the credibility of the allegations of coercion in this case. This is not a case where a single co-conspirator made an initial statement that he later alleged to have been coerced. Instead, there is evidence beyond the allegations of Hurtado and Rosas that establishes a pattern of coercion utilized against four different suspects, as well as corroborating physical evidence as to some of them. The possibility that alleging coercion might subject Hurtado and Rosas to reprisals while in custody also partly offsets any diminution of the credibility of their statements due to their self-serving character.

The prison medical examinations of Hurtado and Rosas arguably undermine the credibility of their allegations of coercion, but on closer inspection, these reports pos-

---

16. During a hearing, the government mentioned that Hurtado and Rosas had been convicted and sentenced [Dkt. 236 at 13], however, the court has never been provided with any evidence of that fact, and the government's account is bereft of detail. Thus, the court assigns the possibility that Hurtado and

Rosas might have been convicted and sentenced no weight in its analysis. On the other hand, the record contains evidence that Lopez Mendivil was "absolved," arguably suggesting that Hurtado and Rosas's allegedly coerced statements implicating her were not true.

sess little probative value. With respect to Rosas, his allegedly coerced statement was made on March 27, 2006, *after* the prison examination. The only physical abuse Rosas says he suffered prior to the medical exam occurred on March 20, 2006, when a bag was placed over Rosas's head and he was struck with an open hand on his chest, which might not leave any noticeable marks or scars on his body. [Dkt. 225-2 at 3, 5–6]. According to Rosas, his March 27, 2006 statement was made after he had been beaten and threatened by Lujan in jail. Thus, Rosas's physical condition on March 22, 2006 has little bearing on the credibility of his allegations.

With respect to Hurtado, on the same day the prison medical examiner reported observing no physical injuries on Hurtado, the court clerk reported bruises on Hurtado's cheeks. Even if the report of the examiner was accurate, the failure to observe visible traces of torture is not necessarily inconsistent with Hurtado's description of the mistreatment he suffered. First, the primary physical abuse described by Hurtado—being held captive, tied up, suffocated with water—would not be expected to cause visible injuries. Second, his statement was dated March 14, 2006, more than a week before he was examined in prison. Based upon Hurtado's testimony, the physical abuse took place days before his prison examination. Whatever visible evidence his ordeal might have left, it is plausible that much of it would have subsided by March 22, 2006.[17]

Assuming that the examination reports accurately reflect the condition of both Hurtado and Rosas as of March 22, 2006, they undermine the credibility of the evidence of coercion only slightly, if at all.

The government (and Chavez Sanchez) rely on the absence of any formal complaint by Hurtado or Rosas, but both men did complain on the record in court before a judge. That neither also filed some other type of complaint matters little, especially in light of the evidence that such formal complaints are ineffective, and merely increase the risk of retaliation. [See Dkt. 225-7; Dkt. 225-9]. The absence of a formal complaint filed with a government organization is not persuasive evidence that Hurtado or Rosas were not coerced.

The fact that some or all of the inculpatory statements may have been true is irrelevant to the issue of whether coercion was used. See Santos, 830 F.3d at 1004 ("It is irrelevant whether Rosas's and Hurtado's statements about their involvement in the kidnapping are true; we do not care if they have indicia of reliability or whether they are corroborated by other evidence. If they were obtained by coercion in violation of the principles in the Due Process Clause of the Fifth Amendment, the statements are not competent and cannot support probable cause."). Nevertheless, evidence that the recantation statements were false would tend to lessen the overall credibility of Hurtado and Rosas. See Fed. R. Evid. 613. Thus, the evidence that Hermosillo identified Rosas tends to undermine the reliability of Rosas's allegations of coercion. Its effect, however, is not significant in light of the weaknesses in Hermosillo's identification. First, Hermosillo's identification of Rosas is inconsistent with her description of her kidnapper. In her statement provided eleven days after the kidnapping, Hermosillo described the perpetrator as 1.9 meters (6'2') in height. She stated that his face was covered with a ski mask during the kidnapping, but said that when he pulled his ski mask, she observed a large mark on his nose, either a

---

17. Obviously, any injuries from the physical abuse Hurtado allegedly endured in October, 2005 also would not have been observable at the time of the March 22, 2006 prison examination.

mole or a scar. She also said that he spoke with an accent indicative of people from Acaponeta or Tecuala. [Dkt. 10 at 250–253, 325–327]. Rosas, however, is 1.78 meters (5'8') in height—half a foot shorter than Hermosillo estimated her abductor to be; without marks or scars on his face; and a native of Mexico City, which is located hundreds of miles inland from the west coast cities of Acaponeta or Tecuala. [See Dkt. 112, Ex. 3 at 23; Dkt. 145 at 32]. Furthermore, Hermosillo's identification took place two and a half months following her abduction, after Hermosillo was "summoned" to a prosecutor's office and shown two black and white photographs of Rosas. [Dkt. 10 at 265, 269].

The government also notes that Mexico "disputes" or "contests" the allegations of coercion, arguing that "Mexico has provided an unequivocal statement through formal diplomatic channels that it firmly denies the torture allegations." [Dkt. 227 at 12]. The government, however, has not submitted any evidence that the persons to whom Hurtado and Rosas confessed deny threatening, beating, torturing, or otherwise coercing Hurtado or Rosas in the course of obtaining the statements implicating Muñoz. Instead the government chooses to rely upon the conclusions of two representatives of Mexico that Hurtado and Rosas had failed to show that they were subjected to coercion.

■ First, the government points out that Chavez Sanchez, "an agent of the Public Prosecutor of the Federation in Mexico[,] described why Hurtado's and Rosas's self-serving allegations of coercion were belied by the factual record," and concluded that, in the eyes of the Mexican government, the claims of coercion "do not have any evidentiary weight." [Dkt. 222 at 17]. Chavez Sanchez does not indicate that she was personally involved in the case against Hurtado, Rosas, or Muñoz, and does not state that she spoke to any of the individuals who participated in the interrogation of either Hurtado or Rosas. The conclusions of Chavez Sanchez, who has no personal knowledge of the circumstances surrounding Hurtado's and Rosas's original confessions, are merely opinions regarding the weight of the evidence, and nothing in her affidavit creates a factual dispute as to the underlying allegations presented by Muñoz's counsel in this case. Relying on Chavez Sanchez's opinion would be equivalent to relying on a government official's affidavit stating that he has reviewed the evidence and has concluded it amounts to probable cause justifying extradition. Relying on the conclusion of Mexican officials that its evidence is competent because there was no coercion would be abdicating the probable cause determination to Mexico. As the Court of Appeals recognized, however, the probable cause determination may not be left "to the Secretary of State—or, for that matter, the Mexican courts"; rather it "has been placed squarely in the judiciary's hands and is ours alone." Santos, 830 F.3d at 1006–1007.

The government's submission of a letter from the legal attache is even less useful. The official does not assert any *facts* creating a dispute. The task that the Court of Appeals has assigned to extradition courts faced with evidence of coercion would amount to a charade if the government could create a dispute that the court could not resolve by doing no more than looking at the evidence and saying that "the requesting state disputes the claims of coercion."

The court expected that the government might proffer the affidavits of one or more law enforcement officials who participated in obtaining the inculpatory statements from Rosas and Hurtado, and who could testify from personal knowledge that no coercion occurred. That possibility was

raised by the court during both the September 14, 2016 and December 6, 2016 hearings. Despite having ample opportunity to cure the weaknesses in its evidence, the government has submitted nothing new to support probable cause—that is, it has not presented either additional evidence that Muñoz participated in the charged offense or additional evidence that the statements of Hurtado and Rosas were uncoerced (and therefore competent). Its failure to do so is telling. See In re Extradition of Strunk, 293 F.Supp.2d 1117, 1139–1140 (E.D. Cal. 2003) (noting that "[w]hile the Philippines is not required to submit all their evidence against the extraditee with a request for extradition, the lack of probable cause connecting Strunk to the crime is highlighted by the fact that corroborating evidence which could have bolstered the case is missing").

The government relies heavily upon the following paragraph of the Court of Appeals' decision:

> We wish to be clear, however, that the scope of our holding here is limited, and that our decision should not be taken as a license to engage in mini-trials on the question of coercion or torture. The extradition court does not have to determine which party's evidence represents the truth where the facts are contested. Where an extradition court first considers evidence that a statement was improperly obtained, but concludes that it is impossible to determine the credibility of the allegations without exceeding the scope of an extradition court's limited review, the court has fulfilled its obligation—as the extradition court did in Barapind [v. Enomoto, 400 F.3d 744 (9th Cir. 2005)]. If the court cannot determine the credibility of the allegations (or other evidence) once it has examined them, the inquiry ends. Probable cause is not undermined, and the court must certify the extradition. See 18 U.S.C. § 3184.

Santos, 830 F.3d at 1007.

■ Although an extradition court is not authorized to conduct a mini-trial, it still must determine the competency of evidence—a determination which involves assessing the credibility of the government's evidence. See Santos, 830 F.3d at 1004–1005; see, e.g., Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir.1986) ("The credibility of witnesses and the weight to be afforded their testimony is solely within the province of the extradition magistrate."); Garcia v. Benov, 715 F.Supp.2d 974, 995 n. 19 (C.D. Cal. 2009) (noting that extradition courts "must decide whether evidence supporting probable cause is credible in light of allegations that the evidence was obtained through torture by foreign officials"); In re Extradition of Singh, 170 F.Supp.2d 982, 1023 (E.D. Cal. 2001) ("[T]he extradition judge makes credibility determinations as to the competence of the evidence supporting probable cause."), aff'd in relevant part, Barapind v. Enomoto, 400 F.3d 744 (9th Cir. 2005). Indeed, this is just the sort of determination the Court of Appeals' insisted upon when it said that "once the evidence of coercion is admitted, courts weigh whether the allegations of coercion are credible, and if so, whether probable cause still exists once the tainted evidence is excluded from the analysis." Santos, 830 F.3d at 1004–1005 (citing Cornejo–Barreto, 218 F.3d at 1008 ("To isolate any possible taint the alleged torture could have on the evidence supporting the probable cause determination, the judge considered the sufficiency of the evidence without the challenged confessions."); Mainero v. Gregg, 164 F.3d 1199, 1206 (9th Cir. 1999) (noting that the magistrate judge "carefully considered the recantations offered ... [and] ... acknowledged that the sugges-

tion of torture is present in the record," but upholding the lower court's conclusion that the torture allegations were not sufficiently reliable to undermine probable cause); In re Extradition of Atuar, 300 F.Supp.2d 418, 431 (S.D.W.Va. 2003) (noting that a recantation statement is admissible "[i]f it is evident ... that the inculpating statement was coerced and not made voluntarily," in which case the court should consider "which of the statements is more reliable in view of the totality of the evidence"), aff'd, 156 Fed.Appx. 555 (4th Cir. 2005); Extradition of Singh, 170 F.Supp.2d at 1021–1023, 1028–1029 (evaluating allegations of torture and concluding that the allegations were reliable and destroyed probable cause as to two of eleven charges); In re Extradition of Contreras, 800 F.Supp. 1462, 1469 (S.D. Tex. 1992) ("Obviously, where the indicia of reliability is on the prior inculpating statement, then a recantation, if admitted, would not negate the existence of probable cause ... [but] where a prior statement is shown to be coerced and the indicia of reliability is on the recantation, then the subsequent statement negating the existence of probable cause is germane.").

In light of the court's finding that credible evidence of coercion undermines the competence of the statements of Hurtado and Rosas implicating Muñoz, the government has not satisfied its burden of showing by a preponderance of the evidence that these statements are competent evidence. Thus, they must be excluded.

### The remaining evidence is insufficient to establish probable cause

■ Other than the statements of Hurtado and Rosas, the government relies upon statements by Hermosillo, her husband, Roberto Castellanos Meza ("Castellanos"), and Benigno Andrade Hernandez ("Andrade") to show that probable cause exists. Although Hermosillo identified Rosas, she does not mention Muñoz. Even putting aside the significant questions concerning the reliability of her identification, without Rosas's statement, Hermosillo's identification of Rosas does not support probable cause to believe that Muñoz was involved in the kidnapping. As for Constellanos, he never saw any of the participants in the kidnapping and he provided no testimony connecting Muñoz to the crime. [See Dkt. 10 at 320–321]. Andrade's statement was made in January 2006, after he was approached by an unidentified man who asked him if he knew anything about "the death of a little girl in August 2005." After the man "insisted," Andrade told him that in July or August 2005, he had a drink with Rosas and Muñoz during which Rosas asked him whether he was interested in a "job." Andrade said the job involved extorting "Beto" for two million pesos. Andrade did not want the job, and he heard nothing further about it. [Dkt. 10 at 202–203]. Other than speculation, Andrade's statement contains nothing that would indicate the "job" entailed a kidnapping of Costellano's family. See Santos, 830 F.3d at 1008 (discussing the remaining evidence and stating that "[s]tanding alone, Andrade's statement is insufficient to support probable cause").

As the habeas court correctly explained: Without Hurtado and Rosas, however, the remaining witness's statements are too thin a reed on which to base a showing of probable cause. While in combination, it shows that there was probable cause to believe Rosas was involved in the crime, the same in not true of Muñoz. At most the evidence suggests that Muñoz may have had information concerning the kidnaping, since he was an associate of Rosas. Just as Hermosillo's testimony serves only to implicate Rosas, Andrade's testimony suggests only that Rosas and Muñoz were interested in committing some type of crime. It does not support the inference that

they were planning to commit the kidnaping at issue in this case.

[Case No. 11–6330–MMM, Dkt. 46 at 18]. See Santos, 830 F.3d at 1008 (discussing whether the evidence was sufficient to show probable cause if the statements of Hurtado and Rosas were excluded, and stating that "[w]e share the district court's doubts").

Therefore, the remaining evidence is insufficient to establish probable cause to believe that Muñoz participated in the kidnapping with which he is charged.

## Conclusion

For the foregoing reasons, the Court declines to recertify Muñoz for extradition.